[Sac. No. 3113. In Bank.—December 17, 1920.]

## THE MACMILLAN COMPANY (a Corporation), Petitioner, v. E. P. CLARKE et al., Respondents.

[1] SCHOOL LAW—FREE TEXT-BOOKS FOR ELEMENTARY SCHOOLS—CONSTITUTIONAL LAW — INAPPLICABILITY TO HIGH SCHOOLS.—High schools are not a part of the elementary school system of the state, and section 7 of article IX of the constitution, providing for free text-books for elementary schools, is therefore inapplicable to high schools.

[2] ID.—FREE TEXT-BOOKS FOR HIGH SCHOOLS — POWER OF LEGISLATURE.—While there is no direct constitutional provision for free text-books for high schools, no further constitutional authority is needed for supplying free text-books for such schools at the discretion of the legislature than the general powers granted by the constitution under which the high school system itself has been created, operated, and maintained, for there is nothing in the constitutional requirement for free text-books for elementary schools which negatives a legislative power to also supply such books to secondary schools, nor is there anything in the nature of a provision for free text-books for high schools to require different or more specific constitutional authority than has been found sufficient for the building and furnishing of schoolhouses, employing teachers, and supplying high school equipment.

[3] STATUTORY CONSTRUCTION — LEGISLATIVE ACTS — PRESUMPTION OF CONSTITUTIONALITY.—The presumption which attends every act of the legislature is that it is within the constitutional power.

[4] CONSTITUTIONAL LAW—SCOPE OF LEGISLATIVE POWER.—The legislature is vested with the whole of the legislative power of the state, and may deal with any subject within the scope of civil

government unless it is restrained by the provisions of the constitution.

[5] ID.—EXPRESS ENUMERATION OF POWERS—EXCLUSION OF OTHERS. Express enumeration of legislative powers is not exclusive of others not named unless accompanied by negative terms.

[6] SCHOOL LAW—FURNISHING FREE TEXT-BOOKS FOR HIGH SCHOOLS NOT A GIFT—CONSTITUTIONAL LAW.—The right of the legislature to extend the free use of text-books to high schools is not within the inhibition of section 31 of article IV of the constitution, which provides that the legislature shall not have the power to make any gift or authorize the making of any gift of any public money or thing of value to any individual, in view of section 1 of article IX of the constitution, which declares that the legislature shall encourage by all suitable means the promotion of intellectual, scientific, moral, and agricultural improvement through the agency of a free public school system, and in view of the fact that the free school system is not primarily a service to individuals, but to the community.

[7] ID.—CONSTITUTIONALITY OF FREE TEXT-BOOK ACT OF 1917 — METHOD OF PAYMENT FOR BOOKS.—The Free Text-book Act of 1917, providing for free text-books for high schools (Stats. 1917, p. 729), is not violative of section 12 of article XI of the constitution as an attempt to impose taxes upon high school districts by direct legislative authority and without the interposition of the corporate officers in whom the power to assess and collect local taxes is vested, in view of sections 1756, 1757, and 1763 of the Political Code.

[8] ID.—CONSTITUTIONALITY OF FREE TEXT-BOOK ACT OF 1917 — METHOD OF PAYMENT FOR BOOKS.—The Free Text-book Act of 1917 (Stats. 1917, p. 729), which in section 1 provides for the adoption by high school boards of text-books for use in high schools and directs that after July 1, 1920, text-books shall be supplied to pupils of such schools free of charge and that the boards may pay for such books out of the special funds of the districts, is not violative of section 12 of article XI of the constitution as an attempt to impose taxes upon high school districts by direct legislative authority, in view of section 1756, 1757 and 1763 of the Political Code.

[9] ID.—RECOVERY OF MONEYS EXPENDED IN FURNISHING BOOKS TO NONRESIDENT PUPILS—INVALIDITY OF PROVISION—CONSTITUTIONALITY OF OTHER PROVISIONS UNAFFECTED.—Section 2 of the Free Text-book Act of 1917, which merely provides a method by which high school districts that have furnished and paid for free text-books to its pupils residing in other parts of the county may recover the moneys thus expended, even if invalid, does not affect the constitutionality of section 1 of such act, which provides a complete procedure for providing such books.

APPLICATION for a Writ of Mandamus to compel the issuance of list of high school text-books as required by section 1750 of the Political Code.   Denied.

The facts are stated in the opinion of the court.

Cushing & Cushing for Petitioner.

U. S. Webb, Attorney-General, and Leon French, Deputy Attorney-General, for Respondents.

SLOANE, J.—This is an application for a writ of mandate to require the respondents, the state board of education and the state superintendent of instruction, to issue a list of high school text-books in conformity to the requirements of section 1750 of the Political Code.

The only question presented is as to whether said section of the Political Code has been repealed and a different procedure substituted by the act of the legislature entitled, "An act to provide for the adoption of text-books for use in the public high schools of the state and for furnishing text-books for the use of pupils of such schools," approved May 18, 1917, referred to as the Free Text-book Act (Stats. 1917, p. 729).   It seems to be conceded by petitioners that their right to the relief demanded depends upon a showing that the last cited act is invalid and inoperative.

Petitioner concisely states its position in the following words: "If the Free Text-book Act contains provisions that conflict with this section (Pol. Code, sec. 1750), and therefore in form repeals the same, the repeal is void, since the repealing statute is unconstitutional.   If, on the other hand, the provisions of the two statutes are not inconsistent, the Political Code section is likewise in exclusive force and effect, since the other statute is unconstitutional."

Two grounds of unconstitutionality are relied on: First, that there is no authority under the constitution of California for providing free text-books to high school pupils; and, second, that the act in question is violative of section 12 of article XI of the constitution, in that it is an attempt to impose taxes upon the high school districts by direct legislative authority and without the interposition of the corpo-

rate officers in whom the power to assess and collect local taxes is vested.

The obnoxious portions of said act are contained in sections 1 and 2 thereof, which are as follows:

"Section 1. The high school board of each and every high school district shall adopt text-books for use in such district from a list prescribed by the state board of education. Such list shall include text-books in such high school subjects as in the judgment of the state board of education require the use of text-books; *provided,* that separate classics in English and modern languages need not be listed. The high school board of each and every high school district may purchase text-books for the use of pupils enrolled in the high schools of such district, which text-books shall at all times be and remain the property of such district, to be supplied to the pupils thereof for use without charge, or at an annual rental, payable in advance, which shall not exceed three dollars for all text-books required by any pupil during any school year; *provided,* that after July 1, 1920, text-books shall be so supplied to pupils of the high schools without charge. Whenever a majority of the heads of families or a majority of the electors in any high school district shall petition in writing the high school board to furnish text-books free for the use of the pupils enrolled in such high school district, it shall thereafter be the duty of the high school board to furnish such text-books free for the use of such pupils. The high school board may pay for text-books furnished in accordance with the provisions of this act, out of the special fund of such high school district. All moneys collected for rental of text-books shall be deposited in the county treasury to the credit of such high school district within thirty days after collection.

"Sec. 2. Whenever the high school board of any high school district purchases text-books for the use of pupils residing in portions of the county not included in any high school district and attending the high school of such district, and furnishes text-books free for the use of such pupils, the board may on or before August first of each year file with the county superintendent of schools of the county in which such pupils reside, a list of such pupils and an itemized statement of the amount expended for text-books for their use during the preceding school year. The county superin-

tendent of schools shall include such amount in his estimate of the county high school fund required, and the board of supervisors shall include the amount in levying the county high school fund. Before the county superintendent of schools shall apportion any of the county high school fund on average daily attendance, he shall transfer from said fund to the fund of each of the several high school districts of the county, or draw a warrant in favor of the board of trustees of such high school district, for the amount claimed by each on account of text-books furnished free for the use of pupils residing in portions of the county not included in any high school district, and attending such high school.''

It may be conceded that there is no specific authority in the constitution for furnishing free text-books to pupils of high schools. Section 7 of article IX of the constitution provides for the adoption of a uniform system of text-books for use in the day and evening elementary schools throughout the state, and directs that they ''shall be furnished and distributed by the state free of cost or any charge whatever, to all children attending the day and evening elementary schools of the state.''

[1] High schools are not a part of the elementary school system of the state. Section 6 of article IX of the constitution provides that ''the public school system shall include day and evening elementary schools, and such day and evening secondary schools, normal schools, and technical schools as may be established by the legislature''; and in providing such secondary schools the legislature has declared (Pol. Code, sec. 1720) that ''the secondary schools of the state shall be known and designated as high schools and technical schools and junior colleges.''

[2] While it is thus apparent that no direct constitutional provision has been made for free text-books in high schools, and that the free text-book provision of section 7 of article IX only applies to elementary schools, no good reason has been suggested why any further constitutional authority should be needed for supplying free text-books to pupils in the high schools at the discretion of the legislature than the general powers granted by the constitution under which the high school system itself has been created, operated, and maintained. Section 5 of article IX of the constitution directs that the legislature ''shall provide for a system of

common schools, by which a free school shall be kept up and supported in each district at least six months in every year," and section 6, in addition to authorizing such secondary schools as may be established by the legislature, further provides that the legislature may authorize and cause to be levied a special state school tax for the support of day and evening secondary schools and technical schools, and that "all revenue derived from such special tax shall be applied exclusively to the support of the schools for which such special tax shall be levied." The liberal policy of the state toward the maintenance of public schools is declared by section 1 of article IX of the constitution: "A general diffusion of knowledge and intelligence being essential to the preservation of the rights and liberties of the people, the legislature shall encourage by all suitable means the promotion of intellectual, scientific, moral, and agricultural improvement." There are other references in the constitution to supplement the conclusion that the organization, management, and support of the public school system has been left within the legislative discretion, subject to the few mandatory provisions quoted whereby it was intended to safeguard certain features of elementary education by the constitution itself.

There is nothing in the constitutional requirement that free text-books shall be supplied to the elementary schools which negatives a legislative power to also supply free text-books to secondary schools.

It is merely a question of how far the legislature may go in its paternal provision for the cause of education without exceeding the bounds of the general constitutional discretion that has been granted. There is nothing in the nature of the provision of text-books for the use of high school pupils to require different or more specific constitutional authority than has been found sufficient for the building and furnishing schoolhouses, employing teachers, supplying crayons, pens, pencils and stationery, maps, charts, and other high school equipment.

[3] The presumption which attends every act of the legislature is that it is within the constitutional power. [4] The legislature is vested with the whole of the legislative power of the state and may deal with any subject within the scope of civil government unless it is restrained

by the provisions of the constitution, and the presumption that the legislature is acting within the constitution holds good until it is made to appear in what particular it is violating constitutional limitations. (*In re Madera Irr. Dist.,* 92 Cal. 296, [27 Am. St. Rep. 106, 14 L. R. A. 755, 28 Pac. 272, 675].)

We have been able to find no authority questioning the right of the legislature to provide free text-books in the high schools. There are decisions holding that boards of education and trustees of school districts cannot exercise such power under general authority to provide necessary supplies for the schools, and without express legislative sanction, but such limitation of power is obvious. The implication is generally conceded, however, that such power does rest with the legislature in the absence of constitutional restraint. (*Board of Education* v. *Common Council,* 80 Mich. 548, [45 N. W. 585]; *Harris* v. *Kill,* 108 Ill. App. 305; *Honey Creek School* v. *Barnes,* 109 Ind. 213, [21 N. E. 747].)

The people have seen fit to safeguard certain features of a free school system by mandatory provisions of the constitution, relating particularly to elementary schools, but beyond this, in the matter of secondary and high schools, the legislature seems to be left with plenary power to act in its discretion for the public welfare.

In considering the power of the legislature of Indiana to establish a free library, the supreme court of that state (*School, City of Marion* v. *Forrest,* 168 Ind. 94, [78 N. E. 187]), applying the general provisions of section 1, article 8, of the Indiana state constitution, which is the same, in substance, as section 1 of article IX of our constitution, says: "That article provides that knowledge and learning generally diffused throughout a community being essential to the preservation of a free government, it shall be the duty of the general assembly to encourage by all suitable means moral, intellectual, scientific and agricultural improvement, and to provide by law for a general and uniform system of common schools wherein tuition shall be without charge and equally open to all. It may with propriety be said that a law providing for the organization and maintenance of public libraries is a part of the educational system of the state." In *McGee* v. *Franklin Pub. Co.,* 15 Tex. Civ. App. 216, [39 S. W. 335], the Texas court of civil appeals, in applying sec-

CLXXXIV Cal.—32

tion 1 of article 7 of the constitution of Texas, which provides that "it shall be the duty of the legislature of the state to establish and make suitable provision for the support and maintenance of an efficient system of free schools," says, in language very pertinent to the situation here, that the section quoted "is a command to the legislature to adopt such ends and means and appliances as in its discretion it may regard necessary or useful for the support and maintenance of an efficient system of free schools. The true meaning to be given the term 'efficient system' embraces the idea of instruction in an enlarged sense, and not that it should be confined to narrow lines. Its meaning is broad enough to allow such a scheme of instruction as the legislature in the exercise of its discretion may provide. It may include all the appliances that are used in this enlightened age, that are necessary or useful as part of an efficient system of public schools, and in furthering and providing for this efficient system the legislature may exercise its discretion in determining what may be necessary or useful as a part of it."

We see no grounds for holding that the express and mandatory requirement of our constitution that free text-books shall be furnished to pupils of the elementary schools should be construed as a limitation upon the power of the legislature to also furnish free text-books for the use of high school pupils. It may well be that it was considered expedient in this as in other respects to require legislative action in behalf of the elementary schools, and to leave the provisions for more advanced education to the discretion of the legislature. [5] Express enumeration of legislative powers is not exclusive of others not named unless accompanied by negative terms. (*Ex parte McCarthy*, 29 Cal. 395.) A construction of a provision of the constitution of Colorado, involving the application of this doctrine, is upheld by the supreme court of that state. The constitution of Colorado requires the legislature to provide for the maintenance of a uniform system of free public schools throughout the state for the education of all residents between the ages of six and twenty-one years. On a question as to the power of the legislature to establish a kindergarten for pupils under the age of six years the court (*In re Kindergarten School*, 18 Colo. 234, [19 L. R. A. 469, 32 Pac. 422]) says: "The legislature being invested with complete power for all the purposes of

civil government, and the state constitution being merely a limitation upon that power, the court will look into it not to see if the enactment in question is authorized, but only to see if it is prohibited. Unless, therefore, the constitution in express terms or by necessary implication limits it, the legislature may exercise its sovereign power in any way that in its judgment will best subserve the general welfare. Read in the light of this rule of interpretation and the wise and liberal policy of the state in educational matters the section is clearly mandatory and requires affirmative action on the part of the legislature to the extent and in the manner specified, and is in no way prohibitory or a limitation on its power to provide free schools for children under six years of age whenever it deems it wise and beneficial to do so."

[6] It seems clear under the comprehensive direction of our constitution, which requires that the legislature "shall encourage by all suitable means the promotion of intellectual, scientific, moral, and agricultural improvement," through the agency of a free public school system, that the right to extend the free use of text-books can only be questioned under some express constitutional limitation. It has been suggested, although the point is not raised by the petitioner in this proceeding, that such inhibition is found in section 31 of article IV of the constitution, which provides that the legislature shall not have power "to make any gift, or authorize the making of any gift, of any public money or thing of value to any individual." It would appear that this objection, if pertinent, applies to every phase of a free school system as well as to the free use of text-books. All the furnishing, equipment, and appliances of our public schools, the very tuition itself, is a contribution of something of value to the school patrons. To argue that some of these agencies and not all are expressly authorized for the benefit of the school population by the general constitutional provisions for the maintenance of a free school system, or that the scope of school service is limited to rudimentary education in the "three R's" and such equipment as was deemed sufficient when our constitution was adopted, is to place our public schools under the blight of the "dead hand," with no chance for expansion and development in line with our growing culture and civilization. Such a construction would be a serious limitation upon the numerous high school centers throughout the state

of California, and the normal and technical schools, with their costly and elaborate equipment of libraries, chemical, electrical, and mechanical laboratories and appliances provided for the use of pupils.

The true explanation of the apparent conflict of authority would seem to be that the free school system with all its equipment is not primarily a service to the individual pupils, but to the community, just as fire and police protection, public libraries, hospitals, playgrounds, and the numerous other public service utilities which are provided by taxation, and minister to individual needs, are for the benefit of the general public. It is so interpreted by the introductory declaration of our constitutional provisions for a free school system that "A general diffusion of knowledge and intelligence" is "essential to the preservation of the rights and liberties of the people." It is to be noted that under the Free Text-book Act the books remain the property of the district, and the pupils have the use of them only in substantially the same manner that they have the use of other school appliances. To hold that the legislature is without power to provide text-books for the high school pupils would place a limitation upon its discretion in encouraging "by all suitable means the promotion of intellectual, scientific, moral, and agricultural improvement" that might seriously cripple our boasted system of public education.

The second point of contention is raised under section 12 of article XI of the constitution, which is as follows: "The legislature shall have no power to impose taxes upon counties, cities, towns, or other public or municipal corporations, or upon the inhabitants or property thereof, for county, city, town, or other municipal purposes, but may, by general laws, vest in the corporate authorities thereof the power to assess and collect taxes for such purposes."

It is claimed that a school district comes within the application of this section, and that taxes for high school purposes are for county or municipal purposes within the meaning of this section. (*McCabe* v. *Carpenter*, 102 Cal. 469, [36 Pac. 836]; *Hughes* v. *Ewing*, 93 Cal. 414, [28 Pac. 1067].)

The general procedure for estimating and levying taxes for maintenance of high schools is provided in sections 1756 and 1757 of the Political Code. Under section 1756 it is made the duty of the high school board to make and file with the

county superintendent of schools an estimate of the amount
of money required for maintaining the high school of said
district for the current school year, showing the amounts re-
quired for (a) teachers' salaries; (b) current expenses; (c)
books, magazines and apparatus; (d) sites, buildings, and
furniture; (e) other miscellaneous expenses. Should the
board of any county high school district fail to make this
estimate, it becomes the duty of the county superintendent
of schools to make it. Such estimate, when fully prepared,
is to be submitted to the board of supervisors. Section 1757
directs that the board of supervisors at the time of making
the tax levy for the year for county purposes shall levy a
special tax on the property of the high school district "suffi-
cient in amount to carry out the purposes legally specified in
the said estimate."

The constitutionality of such a levy and its conformity to
the limitations imposed by section 17, article XI, of the con-
stitution, is upheld by this court. (*People* v. *Lodi High
School Dist.,* 124 Cal. 694, [57 Pac. 660] ; *Board of Educa-
tion* v. *Board of Trustees,* 129 Cal. 599, [62 Pac. 173] ; *Brown*
v. *Visalia,* 141 Cal. 372, [74 Pac. 1042].) The money col-
lected under the tax levy so provided for is required by
section 1763 of the Political Code to be placed in a special
fund for the high school district for which it was intended,
to be used only for the purposes for which the same was
levied, and such moneys are made available for all legitimate
supplies for the schools. The Free Text-book Act under con-
sideration here provides that the high school board may pay
for text-books furnished in accordance with the provisions of
the act out of the special fund of such high school district.
[7]   There thus appears to have been provided an adequate
and valid method of procuring and paying for free text-books
under this disputed act.

The decision in the case of *McCabe* v. *Carpenter,* 102 Cal.
469, [36 Pac. 836], relied upon by petitioner, is made in-
applicable to the present case by the fact that the statute
under which that decision was rendered now stands
amended for the express purpose of meeting the ob-
jection there raised. At the time of the tax levy there called
in question, the act to provide for the establishment of high
schools, approved March 20, 1891 (Stats. 1891, p. 182), re-
quired an estimate to be made by the county superintendent

of schools and to be furnished to the board of supervisors, and made it the duty of such board of supervisors "to levy such rate as will produce the amount estimated to be necessary for such purpose." It was held in that case that the legislature had attempted to vest in the county superintendent of schools legislative power to determine the amount of the tax levy and had deprived the local body whose duty it was to levy taxes of all discretion in fixing the amount to be raised, and was, therefore, unconstitutional. By the High School Act of 1895 [Stats. 1895, p. 293] this objectionable provision of the act of 1891 was amended so as to provide that upon receiving the estimate of the requirements of the district the supervisors were to include in the tax levy "an amount sufficient" to maintain the school. As is said in *People* v. *Lodi High School District* and *Board of Education* v. *Board of Trustees, supra,* this amendment was made to obviate the infirmity of the law of 1891. As thus amended this provision is upheld in the cases last cited and is incorporated in the law governing taxation for high schools as it exists to-day (Pol. Code, secs. 1756, 1757). Petitioner, however, urges that the vice of the act of 1891 is repeated in section 2 of the Free Text-book Act, where, in providing for reimbursement of a high school district for the cost of text-books supplied to pupils residing outside such district upon an estimate furnished by the superintendent of schools, "the supervisors shall include the amount in levying the county high school fund." It is argued that this provision leaves no legislative discretion to the supervisors, but requires them to increase their tax levy by the precise sum included in the superintendent's estimate. It, however, signifies no more than a direction to the supervisors to include in their tax levy a sufficient amount to cover this extra cost. It merely happens, this being a liquidated claim, that the estimate of the superintendent, if his figures are correctly compiled, must of necessity correspond with the "sufficient amount" covering the legislative discretion of the supervisors. If there is a debt of one thousand dollars to be provided for, there can be little difference in meaning between a direction to the supervisors to add the amount to the tax levy, or a direction to make the levy sufficient to cover the indebtedness. The element of discretion only exists in the fact that the taxing power is not bound to accept the superintendent's figures as

correct and final any more than in the matter of estimates for teachers' salaries or other school expenses.

[8] But there is another answer to this last objection to the validity of the Free Text-book Act. Section 2 is no part of the authority or procedure for providing free text-books. Section 1 of the act provides for the adoption by the high school boards of the respective districts of text-books for use in high schools and directs that after July 1, 1920, text-books shall be supplied to pupils of the high schools without charge. This includes all pupils of the school, whether residents or nonresidents of the district. It is further provided that the high school board may pay for text-books furnished in accordance with the provisions of this act out of the special fund of such high school district. Section 2 is an independent and supplemental provision in no way affecting the sufficiency or validity of the preceding enactment. It merely provides a method by which the district that has furnished and paid for free text-books to its pupils residing in other parts of the county may recover the moneys thus expended. It is not apparent how the invalidity of this provision, if it should be held invalid, could affect the constitutionality of the general scheme of providing text-books to pupils of the high schools, or in what way the elimination of this provision for reimbursement would entitle petitioner to the relief demanded. This particular fund provided for by section 2 has no relation to the payment of the publisher's claim for books supplied, referred to in section 9.

[9] We are of the opinion that even though this provision of section 2 might be held invalid, it is not so vitally a part of the general scheme and purpose of the act as to nullify its main features, and the act would still stand as a valid substitute for section 1750, which petitioner is seeking to enforce, at least to whatever extent the two enactments are in conflict.

If it is contended by petitioner that the act of the legislature in placing upon high school districts the burden of providing free text-books must necessarily result in imposing additional taxes upon such districts and municipalities, the answer is that the obligation thus created is not different from those originating in the same manner for other school supplies, the validity of which have been repeatedly upheld by the courts. The school district is created by the legis-

lature as an instrument of the state. Such *quasi*-municipal corporations are but the agents or representatives of the state. They are organized for the purpose of the legislature in its province of providing for the general welfare. The organization and administration of a uniform public school system is especially delegated to the legislature by the constitution. The legislature has provided for the institution and maintenance of schools through the agency of school districts and boards of education. If the legislature is denied the power to fix the nature and extent of the burden to be borne by the districts, and to define and prescribe the duties of school boards in providing equipment for the schools, there would be an end to any coherent or uniform system of public education.

In *State ex rel. Clark* v. *Haworth,* 122 Ind. 462, [7 L. R. A. 240, 23 N. E. 946], at the petition of the relator for writ of mandate to compel the school trustees to certify the required text-books for their school and to procure and furnish such books under the provision of a certain act of the legislature, a somewhat similar question of the invasion of local rights was raised. The supreme court of Indiana in that case, and under the general provisions of a constitution similar to ours, uses this apt language: "Essentially and intrinsically the schools . . . are matters of state and not of local jurisdiction. In such matters the state is a unit, and the legislature the source of power. The authority over schools and school affairs is not necessarily a distributive one to be exercised by local instrumentalities, but on the contrary, is a central power residing in the legislature of the state. It is for the law-making power to determine whether the authority shall be exercised by a state board of education or distributed to county, township or city organizations throughout the state. . . . Both by the constitution and by the intrinsic nature of the duty and the power, the authority is exclusively in the legislature, and the matters over which it is to be exercised solely of state concern. . . . It is impossible to conceive of the existence of a uniform system of common schools without power lodged somewhere to make it uniform; and even in the absence of express constitutional provisions that power must necessarily reside in the legislature. If it does reside there, then that body must have as an incident of the principal power, the authority to prescribe the course

of study as well as the books which shall be used. . . . Having this authority the legislature may not only prescribe regulations for using such books, but it may also declare how the books shall be obtained and distributed.''

Under the California law the legislature has seen fit to create municipal districts through which to organize and conduct the schools. It retains all the powers not expressly conferred upon the school trustees or boards of supervisors.

It may well be questioned if the imposition of financial burdens upon school districts by general laws for maintenance of public schools comes within the restriction of the constitution against taxation for local or municipal purposes. The public schools are state schools, and it is within the discretion of the legislature whether to make them a charge upon the state at large, or to do as has been done in the matter of elementary schools, make them partly a charge upon the state at large and partly upon local districts, or, as in the case of high schools, place practically the entire burden for the local school upon a district organized for that purpose. But conceding the rule as recognized in *McCabe* v. *Carpenter*, 102 Cal. 469, [36 Pac. 836], its application goes no further than to place the constitutional inhibition upon the power of the legislature to assess and collect the tax.

In other words, in dealing with these local municipal agencies for conducting the state administration, the legislature reserves the right to impose burdens which must be met by local tax levies. The whole county government system is based on that theory. The state, for example, enumerates the officers who are to conduct the public business of the municipality and fixes their compensation, which the county is required to pay through the levy, collection, and disbursement of local taxes. In the administration of the public schools the general laws of the state direct the purchase of certain supplies and require the directors or school board to include estimates for that purpose in their annual budgets, and impose upon the board of supervisors of the county the duty of including in the tax levy a sufficient amount to cover the cost. Section 1620 of the Political Code provides that ''writing and drawing paper, pens, inks, blackboards, blackboard rubbers, crayons, and lead and slate pencils, and other necessary supplies for the use of the schools, must be fur-

nished under the direction of city boards of education and boards of school trustees, and charges therefor must be audited and paid as other claims against the county school fund of their districts are audited and paid." This section applies primarily to elementary schools, but the High School Act (Pol. Code, sec. 1741) provides that except as otherwise provided, the powers and duties of high school boards shall be "such as are now or may hereafter be assigned by law to boards of education or boards of school trustees in school districts." And as has been pointed out, section 1756 of the same code requires every high school board to file annually with the board of supervisors an estimate of the amount of money required for the annual expenses of the high school, including that for "books, magazines and apparatus" and for "other miscellaneous expenses," and under section 1757 the supervisors are required to include in their tax levy as a special fund for such high school districts a sufficient amount to cover such expenses. This provision for free text-books stands upon precisely the same grounds.

Having reached the conclusion that there is no constitutional limitation upon the legislature in supplying free text-books, it follows on the facts and reasoning stated that the method of procuring and paying for such text-books as provided in the Free Text-book Act is not in violation of the limitation of section 12, article XI, of the constitution.

The petition is denied.

Wilbur, J., Lawlor, J., Olney, J., Lennon, J., and Angellotti, C. J., concurred.

SHAW, J., Dissenting.—I dissent.

If an amendment of the constitution was necessary to authorize the legislature to provide for free text-books in the elementary schools, as would seem to be implied from the adoption of the amendment of 1912, expressly giving such authority (sec. 7, art. IX), I can see no reason why it is not also necessary in order to authorize the legislature to provide free text-books for the high schools for the use of the pupils therein. Both, alike, are gifts by the state to the pupil, or to the parents or guardians of the pupil, of the use of

the text-books during the attendance at school, and both are, therefore, gifts of a "thing of value" to an individual. As such it is expressly forbidden by section 31 of article IV of the constitution. If the prevailing opinion is correct, the submission by the legislature and the adoption by the people of the free text-book amendment of section 7, article IX, in 1912, was a vain and useless performance.

There is not, as it seems to me, any force in the suggestion that providing free text-books to a high school pupil is no more a gift than is the providing of buildings and the furniture, fixtures, and appliances therein which are reasonably necessary to carry on the schools. The constitution itself provides that the legislature "shall provide for a system of common schools by which a free school shall be kept up and supported" (sec. 5, art. IX), and that "the public school system shall include . . . elementary schools and . . . secondary schools" (sec. 6, art. IX). The history of section 6 and its successive amendments shows that the term "secondary schools" has been substituted for the term "high schools," and means, or at least includes, high schools. The authority to provide for and support high schools of necessity implies authority to provide the buildings and the furniture, fixtures, and appliances therein necessary to carry them on. The authority to provide all these things is, therefore, derived from the express language of the constitution.

The fact that a provision for free text-books is not essential to the maintenance of the high school system is demonstrated by the history of the common or elementary schools in this state and elsewhere. Such schools were successfully and effectively carried on in this state for more than sixty years before any free text-books were furnished for the pupils. Consequently, the authority to keep up and support high schools does not, by implication, include authority to furnish text-books for the pupils who attend them.

If it were not for the aforesaid constitutional prohibition against gifts by the state to any individual, I believe the legislature would have power, under the general grant of section 1, article IV, and under the command of section 1, article IX, to "encourage by all suitable means the promotion of intellectual, scientific, moral, and agricultural improvement," to go to the length of providing free text-books

for pupils in all of the schools. But with this inhibition in force such gift is, in my opinion, beyond the legislative power.
  Rehearing denied.

  All the Justices concurred, except Shaw, J., who dissented.