[S. F. No. 10161. In Bank.—June 17, 1922.]

## VETERANS' WELFARE BOARD et al., Petitioners, v. RAY L. RILEY, as State Controller, Respondent.

[1] VETERANS' EDUCATIONAL ACT—CONSTITUTIONAL LAW.—The Veterans' Educational Act (Stats. 1921, p. 967) which provides for educational aid to veterans of the late World War in the way of payment of the cost of transportation to the institution which they choose to attend, annual tuition fees, cost of books and supplies, and forty dollars per month toward their living expenses, is not unconstitutional as being a gift in violation of section 31 of article IV of the constitution, but is within the plenary power of the legislature to provide for education under section 1 of article IX of the constitution.

[2] SCHOOLS AND SCHOOL LAW — POWER OF LEGISLATURE — CONSTITUTIONAL LAW.—The burden being primarily upon the legislature to determine whether or not the purpose served is a public purpose, and whether or not the development of the state requires the extension of educational facilities and the giving of additional opportunities to different types of students, it may safely be said that the question is one for the legislature and that the broad general restrictions upon the legislature prohibiting gifts should not be held to prevent reasonable allowances made to enable students to secure the advantages of educational institutions.

[3] VETERANS' EDUCATIONAL ACT—EXTRA COMPENSATION—CONSTITUTIONAL LAW.—While it is true that soldiers and sailors not only render service to the United States government, but also to the

states from which they come, there is such doubt about the inclusion of such services within section 32 of article IV of the constitution, prohibiting extra compensation to servants, public officers, and contractors that the supreme court would not be justified in overturning the Veterans' Educational Act on that basis.

[4] ID.—LIMITATION OF ACT TO VETERANS—PROPER CLASSIFICATION.— The Veterans' Educational Act may be justified upon the proposition that it is in furtherance of the general welfare by the promotion of patriotism, which affords a clear basis for a classification confining the benefits of the act to veterans who served in the World's War.

APPLICATION for a Writ of Mandate to require issuance of warrants under Veterans' Educational Act. Granted.

The facts are stated in the opinion of the court.

Walter K. Tuller, M. B. Silberberg, George Hatfield, Milton Sapiro and O'Melveny, Milliken & Tuller for Petitioners.

Dion R. Holm and H. C. Lucas for Respondent.

WILBUR, J.—The petition for a writ of *mandamus* in this case involved the validity of three statutes passed by the legislature for veterans' welfare and aid. We ordered a writ of mandate to issue as to those items of expense involving the validity of the "California Veterans' Welfare Act" (Stats. 1921, p. 969) and the "Veterans' Farm and Home Purchasing Act" (Stats. 1921, p. 815), but reserved the question as to the validity of those items involved in the Veterans' Educational Act (Stats. 1921, p. 967) for further consideration. Upon this question we asked the parties to argue certain questions submitted to them in the following order:

"1. Is the allowance made to the veterans under that bill a gift within the meaning of article IV, section 31, of the Constitution? (See *State* v. *Switzer*, 143 Mo. 287 [65 Am. St. Rep. 653, 40 L. R. A. 280, 45 S. W. 245]; *Baker* v. *Crum*, 177 Ky. 637 [L. R. A. 1918F, 673, 198 S. W. 211]; *State* v. *Clausen*, 113 Wash. 570 [13 A. L. R. 580, 194 Pac. 793, 795]; *State* v. *Johnson*, 170 Wis. 251 [176 N. W.

224, 225]; *McClure* v. *Nye,* 23 Cal. App. 248 [133 Pac. 1145].)

''2. If it is not a gift, is it an allowance or grant to an agent or servant, within the prohibition of article IV, section 31? (See *State* v. *Clausen,* 113 Wash. 570 [13 A. L. R. 580, 194 Pac. 793].) Note in this connection that the decisions upholding pension laws and allowances by the state as made for a public service, place the decision on the ground that the services of the soldier were rendered to the state as well as to the nation. (See *Brodhead* v. *Milwaukee,* 19 Wis. 624 [88 Am. Dec. 717]; *State* v. *Johnson,* 170 Wis. 251 [Ann. Cas. 1913B, 955, note, 176 N. W. 224].)

''3. Assuming that the proposed benefit to the veterans under the Educational Act is neither a gift, grant or allowance within article IV, sections 31, 32, and that for some purposes the legislature may designate the veterans, as a class, and by general law legislate with reference to such class, can it do so when the sole basis of the classification is gratitude or moral obligation, in view of article IV, sections 31, 32?''

Upon the reargument of the matter counsel representing the Veterans' Welfare Board insisted that the law provided for neither a gift, a loan or extra compensation within the meaning of article IV, sections 31 and 32, of the constitution. The validity of the law was maintained upon the plenary power of the legislature to provide for education (Const., art. IX, sec. 1) and upon the right to classify the citizens of the state in any reasonable manner for the purpose of offering such educational facilities. Upon the argument counsel representing the state board of control conceded the validity of the provisions of the Veterans' Educational Act in so far as it authorized the purchase of text-books and the payment of transportation to and from the educational seat. As to the purchase of text-books our decision in *MacMillan* v. *Clarke,* 184 Cal. 491 [17 A. L. R. 288, 194 Pac. 1030], is cited as authority. The plan of transporting school pupils to and from their homes, particularly in large union districts, is quite common in this state, and is expressly authorized by statute (Pol. Code, secs. 1610, 1741, 1764b). Section 1764b of the Political Code authorizes the payment of such transportation ex-

penses not exceeding ten dollars per month to pupils attending high school in an adjoining state. The validity of these sections of the code has not been questioned in the courts of this state. Other states have similar provisions, but in those referred to there seems to be no express constitutional provision against a gift of money to an individual, except in New Jersey, where counties, cities, boroughs, towns, townships and villages are so prohibited (N. J. Const., art. I, sec. 19), and where a loan of credit of the state is prohibited (N. J. Const., art. VI, sec. 3). (*State ex rel.* v. *Jackson,* 168 Ind. 384 [81 N. E. 62]; *Nelson* v. *State ex rel.,* 168 Ind. 491 [81 N. E. 486]; *Lyle* v. *State ex rel.,* 172 Ind. 502 [88 N. E. 850]; *Newcomb* v. *Rockport,* 183 Mass. 74 [66 N. E. 587]; *Mills* v. *School Directors,* 154 Ill. App. 119; *School Dist.* v. *Atzenweiler,* 67 Kan. 609 [73 Pac. 927]; *Re West Fallowfield School Dist.,* 29 Pa. Co. Ct. 600; *Carey* v. *Thompson et al.,* 66 Vt. 665 [30 Atl. 5]; *Queeny* v. *Higgins,* 136 Iowa, 573 [114 N. W. 51]; *Board of Education* v. *Atwood,* 74 N. J. L. 638 [65 Atl. 999]; *Harris* v. *School Dist.,* 72 N. H. 424 [57 Atl. 332]; *State* v. *Hall,* 74 N. H. 61 [64 Atl. 1102]; *Fogg* v. *Board of Education,* 76 N. H. 296 [Ann. Cas. 1912C, 1158, 37 L. R. A. (N. S.) 1110, 82 Atl. 173]. See 35 Cyc. 1001; 37 L. R. A. (N. S.) 1110, note, and 38 L. R. A. (N. S.) 710, note.)

At the time of the adoption of the constitution of 1879, the blind, deaf, and the dumb were entitled under the law to an education in the asylum, located in Alameda County, free of charge (Pol. Code, secs. 2237, 2238, as enacted in 1872), although when the asylum was established a tuition of three hundred dollars per annum was charged to such inmates or students as were able to pay (Stats. 1861, p. 81, sec. 2). Of course, the existence of such a statute at the time of the adoption of the constitution is no justification for sustaining its validity, if opposed to the plain terms of the new constitution, but it is at least some slight evidence that the people did not intend to change a system of education that had been in force for years by the use of such general terms as were used in the constitution concerning gifts. The statute concerning the education of the deaf, dumb, and blind has apparently been carried out, notwithstanding the provisions of article IV, section 31, of the constitution. If this practical interpretation of the con-

stitution for nearly half a century by the executive and legislative branches of the state government is to have any weight, and under cardinal rules of construction it should have some weight, such practical and contemporaneous construction points to the authority of the legislature to make similar provision for others, without violating the constitutional prohibition against making gifts to individuals. In the case of *Barker* v. *Crum,* 177 Ky. 637 [L. R. A. 1918F, 673, 198 S. W. 211], the supreme court of Kentucky held invalid a law providing scholarships in the state university for a few exceptional students on the ground that such provision was a gift in violation of the constitutional prohibitions, but in the later case of *Carman* v. *Hickman County,* 185 Ky. 630 [215 S. W. 408], it was explained that the decision was based in part upon the fact that no exceptional service had been rendered by such students or could be expected from them. In the later case it was stated:

"We do not, however, find any similarity between the legislation condemned in the Barker case and the legislation here drawn in question. In the Barker case the public funds were sought to be appropriated for the benefit of a few favored boys in each county in the state, while other boys equally as deserving were denied these emoluments. It did not and could not be made to appear that the progress or growth or wealth or welfare of the state could be promoted by the privileges conferred on the few boys who were selected from a large number as the recipients of state bounty, and when it was confessed that they had performed no public service entitling them to this distinction there was nothing left for the act to stand on. While in the case we have the appropriation, although it may be treated as having been made directly to and for the chief benefit of those engaged in agricultural pursuits, *its ultimate purpose was plainly to develop the great agricultural interests of the state, and thus contribute to the welfare and wealth of the people of the whole state.* In no sense can it be fairly said that the emoluments and privileges conferred by this act were confined to any man or set of men within the meaning of the section of the constitution relied on." (Italics ours.)

[1] The decision in the case of *MacMillan* v. *Clarke,* 184 Cal. 491 [194 Pac. 1030], clearly authorizes the pur-

chase of text-books for the use of students, if they remain the property of the state or public agency furnishing them. The law under consideration authorizes the Veterans' Welfare Board to purchase necessary text-books and supplies, and, in the absence of an express authority to give the books to the student, the title would remain in the Veterans' Welfare Board. The legislative action, so far as it authorizes the purchase of text-books in furtherance of education, is sufficiently clear. With reference to the matter of transportation the observations of the supreme court of Massachusetts in *Commonwealth of Massachusetts* v. *Interstate Consol. St. Ry. Co.,* 187 Mass. 436 [2 Ann. Cas. 419, 11 L. R. A. (N. S.) 973, 73 N. E. 530], are pertinent. That case involved the right of the legislature's power to require street railway companies to carry pupils to and from school at half-fare. In view of the exceptional benefit thus conferred, the court said:

"In this case the selection of a class is not entirely arbitrary. The education of children throughout the commonwealth is a subject for legislation, which has occupied the thoughts of our lawmakers from early times. The duty of legislatures and magistrates to be diligent in the promotion of education among all the people is specially declared in chapter 5, Sec. 2, of the Constitution of the Commonwealth. Compulsory attendance of children in the schools is provided for by our laws. Rev. Laws, chap. 44, Sec. 1. Money may be appropriated by cities and towns for conveying pupils to and from the public schools. Rev. Laws, chap. 25, Sec. 15. It cannot be said that the legislature may not concern itself with the transportation of children to the public schools in the interest of popular education, just as it provides such children with books and other necessary articles. Rev. Laws, chap. 42, Sec. 35. So far as this statute merely gives help to these pupils in connection with their acquisition of knowledge in the schools, it is justified. As a police regulation in the interest of education, the law may well require street railway companies to permit these children to ride to school upon their cars, without profit to the companies, provided it can be done without causing them loss. But if such a requirement involves expense, the cost can only be put upon the general taxpayers. It cannot be imposed upon the street railway

companies, or upon that part of the public which pays fares to street railway companies. If, therefore, it plainly appeared that the enforcement of this section would cause expense to street railway corporations, which they must bear themselves, or put upon other classes of passengers in the form of increased fares to make good the loss from carrying school children at half rates, we should be obliged to hold that there was a taking of property without due process of law, through unconstitutional discrimination.''

The furnishing of transportation to students attending the higher institutions of learning is a method of partially equalizing the inequalities arising out of the necessity of locating the institution in a certain place. It would hardly be contended that the state university at Berkeley offered its advantages on an equal basis to the high school graduates of Eureka, San Diego, and Berkeley, because of the difference in cost of transportation. In the case of some of our state institutions, such as the state prisons and state hospitals and state schools at Preston and Whittier, the cost of transportation to and from the institution is borne by the state, thus equalizing the burden between the near and more distant counties, although in some of these institutions the cost of maintenance is in part a county charge. There seems no good reason for holding that the legislature has no power under the constitution to in part equalize the opportunities offered to the students.

The question of an allowance to the student for subsistence is a more difficult one. Forty dollars per month authorized by the law as the maximum will not now pay the reasonable expenses of a student, due to the fact that he must subsist away from home and at or near the institution he is attending. In the case of the elementary, grammar, high school and junior colleges the school is usually so near the home of the student that the cost of subsistence is not greatly increased by school attendance, but in the case of the state university the majority of the ten thousand or more students, upon whom the state is spending four and a half millions per year, or about four hundred and fifty dollars per capita, are away from home, and are thus required to spend at least that much more because of that fact. The capital investment of the state is also at the service of the student who is fortunate enough

to have the means to pay the necessary expenses. Shall it be said that the legislature is powerless to in any manner relieve the burden that falls upon a student because its principal institution of learning is located in the center of the state? If special schools are instituted by the state to provide the character of education needed to meet special cases shall it be said that the state must either establish such schools in every school district, or be powerless to bring the proper children into such school? Whittier state school and Preston state school furnish food and clothing to the criminal, the incorrigible and to the needy orphan. They are special schools. Is this the limit of legislative authority? It is, of course, true that the normal and innocent child or scholar is in a different class because it is such with their parents who bear the burden of the state government.

There is no doubt that our educational system in this state and in many other states has gone far beyond what was contemplated at the time the constitution was adopted. It is said, no doubt truly, that the high schools of to-day furnish facilities and opportunities for education superior to the colleges of a century ago. There has been a continual development in our ideas of the necessity and scope of education. This has partly grown out of the fact that the demands of modern life require experts in various lines and the fields of knowledge have been so much widened that a more comprehensive system of education is demanded. It is recognized that the function of education is to fit the scholar for the problem of every-day life and these problems are increasing. The compulsory education laws and the child labor laws have not only required the child to spend a large part of its minority in public or private institutions of learning, but have also prohibited the employment of such children in gainful occupation. The state has thus not only assumed the function of giving an education to the children, but has also insisted upon the surrender by the child and by its parents of the time necessary for that education. The young man or woman graduating from the state university as a rule will have spent from fifteen to eighteen years in the educational institutions of the state, and during that entire period has been a financial burden instead of an asset to parents. The state has con-

tributed enormously to the education of the graduate, but the parents have also done so, and the pupil as well in the surrender of its earning capacity. While the state university is theoretically open to all, it is practically confined to those who have attained certain standards of education and who have the financial ability to leave their homes and reside in the vicinity of the university during their university course. This necessarily confines the advantages of this institution to the comparatively small number of high school graduates or the graduates of similar institutions who have the means to supplement the expenditures of the state in providing schoolrooms and teachers by their own means for providing books, apparatus and food and clothing during this period in which they are earning nothing but are surrendering their time to gain the education which the state attempts to furnish. Can it be said that the constitution is so written as to absolutely prohibit the state from extending aid in addition to the tuition and schoolrooms which are already provided in our higher institutions of learning? To say that the broad general restrictions against the making of gifts is such a limitation upon the part of the legislature and prohibits for all time the meeting of the exigencies that may develop in the educational system seems to us going further than the founders of the constitution intended. For more than a century the federal government has maintained at West Point an academy for the education of young men for the army, who, during the period of their training, are paid a salary which is amply sufficient for their maintenance, including food and clothing, with a small amount for spending money and for the procuring of an outfit upon graduation. The same is true of the United States naval academy maintained at Annapolis since 1845. It is true that the cadets at these institutions are being educated as officers in the army and navy and that in a sense their education and maintenance is a consideration held out to them for their agreement to subsequently render that service.

The constitution of this state, like that of most of the states, requires that its judicial officers shall have special education, evidenced by admission to practice as an attorney at law. Thus, one of the three coequal subdivisions of the government is dependent upon a special and technical edu-

cation and these requirements are increasingly rigorous. If there should for any reason be a dearth of suitable material for such offices, would the state be powerless to aid worthy students, because of a prohibition against making gifts to individuals? We fully recognize the clear distinction between the question involved in the payment of this compensation to the military and naval cadets in these national institutions, the supposititious case of legal education, in preparation for special service to the state; and the broader question where the government receives only the indirect advantage of an educated citizenship. However, in the case at bar the government receives the highly important advantage of the stimulation of patriotism by a definite recognition of the magnificent, unhesitating, and courageous service of the World War veterans, whose valor and spirit turned the tide of history in favor of our form of government, based, as it is, upon the fundamental principles of the freedom and equality of all men and upon their equal right to participate in the government and to the advantages of such government. This advantage derived from the stimulation of patriotism is sufficient to justify outright gifts of money by way of bonus and pension, and is universally recognized as a sufficient ground for such expenditures. Where there is added to this the additional advantage to the state of giving an education to those who during their term of service have shown their devotion to the government and their obedience to its authority, and who have been intensively educated in patriotism, there would seem a clear basis for a classification confining the benefits of this special education provision to veterans.

[2] Bearing in mind that the burden is primarily upon the state legislature to determine whether or not the purpose served is a public purpose, and whether or not the development of the state requires the extension of educational facilities and the giving of additional opportunities to different types of students, it may safely be said that the question is one for the legislature and that the broad general restrictions upon the state legislature prohibiting gifts should not be held to prevent reasonable allowances made to enable students to secure the advantages of educational institutions.

In view of the conclusion that the legislative power to provide for education includes the power to make the expenditures involved under this law, is it permissible to confine the advantages of the law to veterans who have served in the World's War?

It must be conceded that such classification is permissible for legislation having for its purpose the giving of rewards, bonuses or extra compensation to ex-soldiers. The decisions all agree upon this point and it is unnecessary for that reason to cite specific cases. We have held in the opinion already filed (*Veterans' Welfare Board* v. *Riley,* 188 Cal. 607 [206 Pac. 631]), that it is permissible to confine the benefits of those acts to the veterans, and this decision was based upon the ground that such citizens could be designated as a class to receive the benefit of those acts. Unless, therefore, we hold that the benefits conferred by the educational act constitute extra compensation or a gift of money or a loan of credit prohibited by the constitution (art. IV, secs. 31, 32), the principles applicable in the decision already rendered are also applicable here, so far as classification is concerned.

One reason that we called for reargument of the constitutionality of this law was the fact that it seemed to us that if the classification was made for the sole purpose of conferring a benefit by way of extra compensation or allowance to the soldiers of the World's War, it could not be justified in view of the provisions of section 32 of article IV which expressly prohibits the granting of any extra compensation or allowance to any public officer, agent, servant or contractor after the service had been rendered. In our order directing the reargument we called attention to the decision of the supreme court of Washington in *State* v. *Clausen,* 113 Wash. 570 [13 A. L. R. 580, 194 Pac. 793, 797]. That court disposed of the matter in the following paragraph:

"Our attention has been called to section 25 of article 2 of the state Constitution, which provides that the legislature shall never grant any extra compensation to any 'public officer, agent, servant or contractor after the services shall have been rendered or the contract entered into. . . .' But this provision has no application to the present statute. The parties who are to receive compensation under

the act do not come within the constitutional specifications. This provision of the Constitution does not seem to be insisted upon, and it would necessarily prolong this opinion to enter upon a further discussion of it.''

The law under consideration by the supreme court of the state of Washington in that case provided for a bond issue of eleven million dollars for the raising of funds to pay money directly to the veterans of the World's War and to establish a fund known as the Veterans' Compensation Fund. In view of the fact that the court expressly held that the statute was one for extra compensation it must have been the view of the court that the soldiers were neither public officers, agents, servants or contractors within the meaning of the state constitution of that state, for the court expressly stated that:

''The act before us is based upon the theory of *compensation or compensation in addition* to that which the beneficiaries thereunder have already received from the federal government. For the service rendered by those who came within the terms of the act in the cause which was then of paramount importance there arose a moral obligation to compensate for such service, and, as has already been pointed out, such an obligation is sufficient to sustain the taxing power of the state. This decision will be rested upon the ground that the legislative power of the state is sufficient to enable it to make *compensation for the services* rendered because there is a *moral obligation to compensate* for those services and that such services were public, and not private.'' (Italics ours.)

Our own decisions consistently hold that an appropriation of public funds based upon a moral obligation as a consideration is a gift within the meaning of the constitution (see cases cited in *Veterans' Welfare Board* v. *Riley, supra*). The reasoning of the supreme court of Washington, by which it avoids the conclusion that the payment was not a gift, would not, therefore, apply under our decisions. But its conclusion that ex-soldiers of the United States army are not public officers, agents, or contractors within the meaning of article IV, section 32, is directly in point. It is true that a soldier is neither a public officer, a servant, an agent or a contractor as those terms are ordinarily used. It is also true that the general practice

throughout the country which obtained at the time and previous to the adoption of the constitution of 1879 was to grant pensions and allowances to ex-soldiers. It may well be that if the constitution was intended to prohibit the granting of allowances to ex-soldiers we might expect to find such prohibition definitely stated in the constitution itself. State aid in various forms had been the rule rather than the exception in the case of ex-soldiers and naval men. The constitution draws a rigid distinction between officers of this state and of its various subdivisions, and those of the United States (art. IV, secs. 20, 21; art. V, sec. 12). It uses the term "soldier" (art. I, sec. 12). It expressly refers to persons employed in the service of the United States (art. II, sec. 4), and it is altogether probable, all things considered, that the words "public officers" and "servants" in article IV, section 32, do not refer to soldiers, sailors or marines in the service of the United States. On the other hand, it is equally clear that all appropriations in favor of ex-soldiers are based upon the fundamental and underlying principle that such soldiers not only act for the federal government but also for the state government and that in their effort to maintain the Union they also maintain the separate states making up that Union. The soldier from each state is a soldier from the state of his residence as well as of the United States.

In *Beach* v. *Bradstreet*, 85 Conn. 344 [Ann. Cas. 1913B, 946, 82 Atl. 1030], an act of the legislature of that state providing for allowances to be made to all ex-soldiers residing in the state of Connecticut at the time of the passage of the act in 1911 who had served in the army and navy and marine corps or revenue service of the United States during the Civil War and received an honorable discharge therefrom, was held unconstitutional because it extended the benefit not only to those who had been residents of the state at the time they entered the service of the United States, but also to all those who had subsequently come into the state and thus was made equally applicable to the citizens of other states. It was held that the extension of this bounty to soldiers from other states who served in the United States army was a violation of the implied constitutional restriction against the giving of public money for private purposes. In discussing that matter the court said:

"The nation can take for its defense the men and the treasure of Connecticut measured only by its necessities. It can call upon her to do her assigned part; it cannot call upon her to do the assigned part of some other State. The soldiers and sailors of other states, and the aliens, who served, were not here; to them she owed no duty. She could not tax her people to pay bounties to these to induce them to enter the service of the United States; no more can she reward them for their services in the war. . . . A State's bounty must be limited to her own soldiers and sailors. Service to the credit of other States is not service for her. The grant to aliens, to widows and parents, to pensioned widows and parents, without affecting the principle involved, marks with increasing clearness the lengths to which a vicious principle of taxation may lead. Cooley, in his work on Taxation (vol. 1, 3d ed.), page 195, says: "In deciding on which side the tax shall fall we must be governed 'mainly by the course and usage of the government, the objects for which taxes have been customarily and by long course of legislation levied, what objects or purposes have been considered necessary to the support and for the proper use of the government.' . . . States have granted pensions to the disabled or indigent soldiers and sailors; but, so far as we have discovered, no State has granted a pension to soldiers and sailors who have served in, and been honorably discharged from, the United States service, without regard to disability or indigence."

The cases authorizing state aid as legitimate expenditure of state money are all based upon the relationship borne by the soldier to his own state. The basis of this special bounty is variously spoken of as extra compensation, as a gratuity or reward, or as a method promoting patriotism, all of which are recognized as public purposes. Counsel for the respondent in this case concede that the allowance made to ex-soldiers by the Educational Act does not come within the prohibition of article IV, section 32, and agree with counsel for the petitioners that the ex-soldiers are not public officers, servants or contractors within the meaning of that constitutional provision. It is clear that classification by which the ex-soldiers are separated from the body of the community could not be justified where the sole and only purpose thereof is to grant extra compensation which was

expressly prohibited by article IV, section 32. It is equally clear that if the purpose is not to grant extra compensation within the meaning of that section, the classification is justifiable even though the purpose of it is to authorize a gift or loan of public money (assuming for the moment that such gift or loan is not prohibited by article IV, section 31). [3] While it is true as the cases recognize that soldiers and sailors of the United States not only render service to the United States government but also to the states from which they come, we think there is such doubt about the inclusion of such services within article IV, section 32, prohibiting extra compensation to servants, public officers and contractors, that we would not be justified in overturning the act of the legislature upon that basis. It remains for us, therefore, to determine whether or not the classification is otherwise permissible. This question is readily answered in the affirmative, if such a classification has a reasonable relation to the subject matter under consideration. If the statute only authorized the extension of aid to those whose studies were interrupted by the war and who were during the time they were engaged in the service of the United States thus precluded from continuing their education, it would be clear that the classification was a perfectly justifiable one. If it is proper to select from the student body of various institutions of learning certain individuals because of their age and physical qualifications for service in the forces of the United States, allowing those of other ages and of inferior physical qualifications to remain and pursue their studies, it is clear that it would be equally permissible to again consider such classification when the time came for the demobilization of the army, and when the young men who had been deprived of the opportunity to continue their education because of the call to service were permitted to again resume their studies. Assuming that the state has power to make the provisions herein made for its citizens for the purpose of extending to them the benefits of an education, it would follow that the particular citizen who had been deprived by the war of that opportunity would be susceptible of classification as the recipients of the benefits of a statute intended to promote such education. It is possible that the statute under consideration is susceptible of the construction that it ap-

plies only to those whose education was so interrupted, and no doubt if its constitutionality depended upon such a construction it might very well be held that the provisions of the law authorizing the extending of aid to veterans to *continue* their education could be held to confine the benefits of the law to those who at the time of their enlistment were in educational institutions receiving instruction and thus receiving an education which was to be *continued* by the means proposed by the statute.

If, however, the statute is susceptible of a broader interpretation and this interpretation is constitutionally justified it must be given that interpretation. It must be conceded that the extending of these special benefits to veterans of the World War would tend to promote patriotism. The promotion of patriotism is recognized as a proper exercise of governmental functions and as a field for the expenditure of public money. [4] We think, then, that this legislation may be justified upon the proposition that it is in furtherance of the general welfare by the promotion of patriotism and that the classification made is justifiable upon that basis. (See *State* v. *Johnson*, 170 Wis. 251 [14 A. L. R. 1145, 176 N. W. 224], and *Wheelon* v. *South Dakota Land Settlement Board*, 43 S. D. 551 [181 N. W. 359].)

It follows that the aid extended to the veterans of the World War under the Veterans' Educational Act is a constitutional exercise of the legislative authority.

Peremptory writ of mandate will issue.

Sloane, J., Lennon J., Waste, J., Lawlor, J., and Shurtleff, J., concurred.

SHAW, C. J., Dissenting.—I dissent.

The constitution (art. IV, sec. 31) provides that the legislature shall not have power "to make any gift, or authorize the making of any gift, of any public money or thing of value to any individual." Certain exceptions are provided for, but they only serve to emphasize the prohibition as to everything not within the exceptions. None of them provides for gifts to individuals to assist them in obtaining an education. The language quoted is simple, unambiguous and clear.

The act in question (Stats. 1921, p. 967) provides for and authorizes the making of gifts to persons who served in the military forces of the United States in the late war, out of the public money of the state, not exceeding one thousand dollars to any one person, as follows: 1. The paying of the cost of their transportation, once a year, from their respective homes to the university, college or school which they choose to attend to begin or continue their education. 2. The payment of their annual tuition fees, if any, at such institution. 3. The payment of the cost of the "books and supplies" necessary for their education there. 4. The payment of forty dollars a month for each month to any student during his actual attendance upon any day school, to be applied to defray his living expenses.

If this is not the making of gifts of public money to these individuals, nothing could be. It is as clear and unmistakable a violation of the prohibition of section 31 as could be devised.

It is in fact conceded that it is contrary to the above quoted limitation of section 31 upon the legislative power. The claim is that, so far as education is concerned, section 31 is modified and controlled by section 1 of article IX, the article on the subject of education. It reads as follows: "A general diffusion of knowledge and intelligence being essential to the preservation of the rights and liberties of the people, the legislature shall encourage by all suitable means the promotion of intellectual, scientific, moral and agricultural improvement."

It is a well established rule of construction that where a constitution has been prepared by a convention and submitted to the people and adopted as a whole, it will not be assumed that any provision therein was intended to set aside or qualify another provision, unless such intent appears, either expressly or by necessary implication, or unless the inconsistency is so clear that no other conclusion can reasonably be made from the language. No such intent appears and no such inconsistency exists with respect to the two provisions here in question. Section 1 of article IX does not even purport to grant power to the legislature. It imposes on it a duty to encourage the promotion of education in the things therein specifically mentioned. But it directs that this shall be done "by all suitable

means.'' This necessarily implies that it is not to be done except by "suitable means.'' So understood, it is not contrary to or inconsistent with the prohibition of section 31 above quoted, but is clearly in harmony with it. The meaning is that it shall encourage education by the use of the powers which it has under the other provisions of the constitution. The making of gifts of public money to individuals cannot be considered as a "suitable means'' for the promotion of education, because such gifts are expressly prohibited, and because, in the absence of any language to indicate such intent, it cannot be that section 1 of article IX was meant to sanction a violation of any other part of the constitution. For illustration, and to show the length to which such a doctrine would lead, it cannot be supposed that the direction to the legislature to encourage the promotion of education by all suitable means was intended to or does authorize it to promote education by enacting a special law for the assessment of taxes to raise money for educational purposes, contrary to subdivision 10 of section 25, article IV; or a special law exempting property of a private school from taxation (subd. 20); or a special law providing for the management of common schools (subd. 27); or a law authorizing a lottery or gift enterprise to raise money for educational purposes (art. IV, sec. 26); or a law providing for the taking of private property for educational purposes without compensation to the owners (art. I, sec. 14); or, in short, any law transcending any of the other express restrictions upon legislative power found elsewhere in the constitution. Yet there is as much warrant for allowing any of these things to be done as there is for allowing the making of gifts to individuals from public money to enable such individuals to obtain an education with less effort than would be required without such aid.

The suggestion that it would be good public policy to make such gifts for that purpose presents a matter beyond the proper scope of our inquiry. The public policy fixed by the constitution cannot be changed by the legislature, or by the courts, unless they exceed the limits of their own powers. If public opinion has so changed since the adoption of these constitutional provisions in 1879 that it now favors a different policy from that therein fixed and declared, there is only one legitimate method to give effect

to such change, that is by amending the constitution so that it will express the present desire of the people, instead of the desire they expressed in 1879.

It may be that in the absence of such declaration of policy in the constitution as it is, and in the absence of any restriction forbidding the making of gifts to individuals, the legislature could lawfully provide for aid to individuals who have served the country in the late war to enable them to obtain an education. But even if it were conceded that such persons had been in the service of the state in the war, such a disposition of public funds is expressly forbidden by section 32 of article IV of the constitution, which declares that "the legislature shall have no power to grant . . . any extra compensation or allowance to any public officer, agent, servant, or contractor, after service has been rendered." (*Conlin* v. *Board,* 99 Cal. 21 [37 Am. St. Rep. 17, 21 L. R. A. 474, 33 Pac. 753]; *Molineux* v. *State,* 109 Cal. 378 [50 Am. St. Rep. 49, 42 Pac. 34]; *Taylor* v. *Mott,* 123 Cal. 497 [56 Pac. 256].) There was no law authorizing compensation by the state for any service of that character at the time the service was rendered. Hence, any compensation now made for such service, still conceding it to have been a service to the state, would be "extra compensation," within the meaning of this section. The proposition that a mere moral obligation, or any obligation not enforcible by law, cannot be made the basis of an allowance of public money to the person or class of persons claiming to be beneficiaries of such obligation is settled beyond question by the decisions last cited.

It is my opinion that however desirable we may believe such a law to be, the court must say that it is unconstitutional and void and that the writ of mandate should be refused.