JOSEPH E. CLAYTON, ACTING COMMISSIONER OF THE NEW JERSEY DEPARTMENT OF EDUCATION AND THE NEW JERSEY EDUCATIONAL FACILITIES AUTHORITY, A PUBLIC CORPORATION AND GOVERNMENT INSTRUMENTALITY IN THE DEPARTMENT OF EDUCATION, PLAINTIFFS-RESPONDENTS, AND ASSOCIATION OF INDEPENDENT COLLEGES AND UNIVERSITIES IN NEW JERSEY, PLAINTIFF-INTERVENOR-RESPONDENT, v. JOHN A. KERVICK, STATE TREASURER OF NEW JERSEY, DEFENDANT-APPELLANT, AND HOWARD LEVINE, JACQUELINE LEVINE, JOSEPH MARZELL AND BELLE MARZELL, DEFENDANTS-INTERVENORS-APPELLANTS.

Argued October 26 and 27, 1971—Decided December 21, 1971.

*Mr. Alfred C. Clapp* and *Mr. Arnold K. Mytelka* argued the cause for defendant-appellant Kervick.

*Mr. Leo Pfeffer,* of the New York bar, argued the cause for defendants-intervenors-appellants Levine *et al.,* (*Mr. Lewis Stein,* attorney).

*Mr. Stephen Skillman,* Assistant Attorney General, argued the cause for plaintiffs-respondents Clayton *et al.* (*Mr. Alfred L. Nardelli,* Deputy Attorney General, on the brief; *Mr. George F. Kugler, Jr.,* Attorney General of New Jersey, attorney).

*Mr. Joel A. Wolff* argued the cause for plaintiff-intervenor-respondent Association of Independent Colleges and Universities in New Jersey (*Mr. William C. Slattery,* on the brief; *Messrs. Pitney, Hardin and Kipp,* attorneys).

The opinion of the Court was delivered by

WEINTRAUB, C. J. Before us for reconsideration is *Clayton v. Kervick,* 56 *N. J.* 523 (1970), where we held the statute in question did not offend the church-state provision of the First Amendment to the Federal Constitution. Upon review of that case, the United States Supreme Court handed down this memorandum, 403 *U. S.* 945, 91 S. Ct. 2274, 29 *L. Ed. 2d* 854 (1971):

* * * Judgment vacated and cases remanded to the Supreme Court of New Jersey for reconsideration in light of this Court's decisions in Lemon et al. v. Kurtzman, et al., 403 U. S. 602, 91 S. Ct. 2105, 29 L. Ed. 2d 745; Tilton et al. v. Richardson et al., 403 U. S. 672, 91 S. Ct. 2091, 29 L. Ed. 2d 790; Earley et al. v. DiCenso et al., 403 U. S. 602, 91 S. Ct. 2105, 29 L. Ed. 2d 745, and Robinson et al. v. DiCenso et al., 403 U. S. 602, 91 S. Ct. 2105, 29 L. Ed. 2d 745. Mr. Justice Black is of the opinion that the judgment should be reversed. Mr. Justice Brennan took no part in the consideration or decision of these cases.

We called for further argument, written and oral, upon the meaning of that memorandum.

## I

The statute is the New Jersey Educational Facilities Authority Law, *N. J. S. A.* 18A:72A–1 *et seq.* As stated in our earlier opinion, 56 *N. J.* at 526–527:

The statute is designed to provide funds to finance the construction of dormitories and educational facilities for public and private institutions of higher education. To that end, the statute created the New Jersey Educational Facilities Authority (herein Authority), 'a public body corporate and politic.' *N. J. S. A.* 18A:72A–4(a). It should be stressed at once that the statute does not provide for a gift or grant of State moneys to any institution. Rather the plan

calls for the Authority to operate on a self-sustaining basis. The Authority sells its bonds to private sources and pays the principal and interest out of revenues gained by the use of the moneys so obtained. Secs. 11, 30, and 31. As to private educational institutions, the Authority may lend the moneys to the institution, or the Authority may erect a facility on lands conveyed to it by the educational institution, return the improved property to the institution by a lease, and reconvey title upon full performance of the lease. Either way, the charge the Authority makes must cover the principal of and interest on the bonds the Authority issues for the moneys employed in the transaction. Thus there is no gift or grant of moneys. And the bonds are the obligations of the Authority alone. They are not debts of the State, and the State's credit is not pledged. Secs. 10 and 37. The bonds and property of the Authority are exempt from State and local taxation, sec. 18, and this, together with the exemption of the bonds from federal taxation, reduces the cost of money to the Authority and makes the plan feasible.

In dealing with the church-state issue we applied the test of *School District of Abington Township, Pa. v. Schempp,* 374 *U. S.* 203, 222, 83 *S. Ct.* 1560, 1571, 10 *L. Ed. 2d* 844, 858 (1963), that "to withstand the strictures of the Establishment Clause there must be a secular legislative purpose and a primary effect that neither advances nor inhibits religion." We had no doubt, and have none now, that the legislative purpose is wholly secular. The Legislature seeks to advance higher education and to do so whether such education is provided in public or private colleges. 56 *N. J.* at 527–528. In finding neither aid nor hindrance to religion, we stressed the self-sustaining feature of the program, and although we recognized that something of value was received by the private institution in that moneys were made available at a cost below that of the marketplace, if there available at all, we likened the program to other governmental ventures sustained by revenues paid by users, secular and sectarian. We said, 56 *N. J.* at 530–531:

A benefit may indeed be conferred upon the sectarian purchaser, for government may well provide services more economically than the private entrepreneur who was supplanted, but the benefit is common to all consumers and is not specially conferred upon the sectarian consumer as a contribution to its sectarian aims. * * *

Here we are dealing essentially with a banking operation conducted by an agency of the State. If the operation were as extensive as a general banking business, it could hardly be urged the establishment clause would bar every sectarian borrower. We see no difference in principle because the State has embarked upon a banking venture in a limited area in which, in words of section 1, 'financial resources are lacking' for the construction of 'required dormitory and other educational facilities at public and private institutions of higher education.' Again, this is not to deny that the sectarian institution will derive a 'benefit' from the governmental service. Obviously there is a benefit in obtaining something not provided by regular commercial sources, or in obtaining it at a lower rate of interest. Here, as in other areas of commercial activity a State may enter, the State has credit and tax advantages which reduce the cost of money to it, and, further, since the State has no stockholders, it may offer its service without a profit. The consumer thereby may enjoy a dollar benefit. But the fact remains that the State furthers a public purpose and the benefit to sectarian interests is as incidental as in the sale of municipally supplied water or electricity. The Legislature, perhaps to avoid constitutional involvement under the establishment clause or perhaps to limit the statute to the furtherance of 'higher education,' expressly excluded 'any facility used or to be used for sectarian instruction or as a place for religious worship' in its definition of 'educational facility.' No one contends this exclusion impinges upon the First Amendment, and we do not suggest that it does. The question is only whether the establishment clause requires government to refuse to sell to a sectarian institution a financing service it offers to others who except for religious identification are similarly situated. We are satisfied the Constitution holds no such mandate.

In thus sustaining the statute on the basis of *Schempp,* we did not test it by the additional, independent standard which was suggested in *Walz v. Tax Commission,* 397 *U. S.* 664, 90 *S. Ct.* 1409, 25 *L. Ed. 2d* 697 (1970), and which later emerged in *Lemon* and *Tilton,* that the statute must not foster "an excessive government entanglement with religion."[1]

---

[1]*Lemon* said, 403 *U. S.* at 612, 91 *S. Ct.* at 2111, 29 *L. Ed. 2d* at 755:

Every analysis in this area must begin with consideration of the cumulative criteria developed by the Court over many years. Three such tests may be gleaned from our cases. First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion, *Board of Education v. Allen,* 392 *U. S.* 236, 243, 88 *S. Ct.* 1923,

## II

We will first search *Lemon, DiCenso,* and *Tilton* for some guidance upon this remand.

*Lemon* involved a Pennsylvania statute which reimbursed private elementary and secondary schools for the cost of teachers' salaries, textbooks, and instructional materials with respect to specified secular subjects. The opinion dealt also with the appeals in *Earley v. DiCenso* and *Robinson v. DiCenso,* both of which involved a Rhode Island statute providing for payment by the State directly to teachers in private elementary schools of a supplement up to 15% of their annual salaries. Under both statutes, the private schools included church-related educational institutions. Both statutes were held unconstitutional.

The Court found neither statute was intended to advance religion. The Court agreed the purpose was "to enhance the quality of the secular education in all schools covered by the compulsory attendance laws," and this in pursuit of a State's "legitimate concern for maintaining minimum standards in all schools it allows to operate." 403 *U. S.* at 613, 91 S. Ct. at 2111, 29 *L. Ed. 2d* at 756. The Court pointed out that both statutes contained restrictions designed to guarantee that the State aid would support the secular, but not the religious, educational function. The Court found it unnecessary to say whether those precautions restricted "the principal or primary effect of the programs to the point where they do not offend the Religion Clauses," because "we conclude that the cumulative impact of the entire relationship arising under the statutes in each State involves excessive entanglement between government and religion." 403 *U. S.* at 613, 91 S. Ct. at 2111, 29 *L. Ed. 2d* at 756. The excessive entanglement was found in the "comprehensive, dis-

1926, 20 *L. Ed. 2d* 1060, 1065 (1968) ; finally, the statute must not foster 'an excessive government entanglement with religion.' *Walz,* supra, [397 U. S.] at 674, 90 S. Ct. at 1414, 25 *L. Ed. 2d* at 704.

criminating, and continuing state surveillance" required by the statutes to confine the State aid to the secular mission of the schools. 403 *U. S.* at 619, 91 S. Ct. at 2114, 29 *L. Ed. 2d* at 759.

The details underlying that finding are evident from a description of the statutory programs.[2] We need not discuss them, because the significance here of *Lemon* reposes in its adoption of the concept of excessive entanglement rather than in the application of that concept to the specific terms of the Rhode Island and Pennsylvania acts. We add that the Court did not speak only of entanglement inherent in the operative provisions of the statute itself. It pointed also to the potential for divisive political impact upon candi-

---

[2]The Rhode Island Salary Supplement Act authorized payment by the State of a supplement, not in excess of 15% of his annual salary, to every teacher of secular subjects in a nonpublic school at which the average per-pupil expenditure on secular education is less than the average in public schools. As supplemented, the teacher's pay may not exceed the rate in public schools. The nonpublic school must submit financial data, and if the per-pupil expenditure exceeds the statutory limitation, the records of the school must be examined to allocate the portion attributable to secular education. The teacher may teach only subjects offered in the public schools and use only teaching materials used in public schools. The teacher must agree not to teach a course in religion during the time he receives a salary supplement. About 95% of the nonpublic elementary school pupils attended schools affiliated with the Roman Catholic Church, and the parochial school system was found to be an "integral part of the religious mission of the Catholic Church."

As to the Pennsylvania statute, it authorized the Superintendent of Public Education to "purchase" specified "secular educational services" from a nonpublic school by a direct payment to the school. "Under the 'contracts' authorized by the statute, the State directly reimburses nonpublic schools solely for their actual expenditures for teachers' salaries, textbooks, and instructional materials. A school seeking reimbursement must maintain prescribed accounting procedures that identify the 'separate' cost of the 'secular educational service.' These accounts are subject to state audit." 403 *U. S.* at 609, 91 S. Ct. at 2109, 29 *L. Ed. 2d* at 754. Reimbursement is limited to specified courses in "secular" subjects. Textbooks and instructional materials must be approved by the Superintendent. Reimbursement is prohibited for any course containing "any subject matter expressing religious teaching, or the morals or forms of worship of any sect."

dates for office and upon political campaigns, especially because the programs involved annual appropriations of money, and added that it could not be confident that such statutes would not be a first step in a long progression of intensified entanglement.

*Tilton* involved the federal Higher Education Facilities Act, 20 *U. S. C. A.* §§ 701–758. Like the statute before us, the federal act sponsors higher education by aiding the construction of buildings and facilities used exclusively for secular educational purposes. Unlike our State statute, the federal act authorizes outright "grants" of money. The federal statute also authorizes "loans," 20 *U. S. C. A.* §§ 741–745, but only "grants" were involved in *Tilton*. No part of a project thus federally aided may be used for sectarian instruction, religious worship, or the programs of a divinity school. The United States retains a 20-year interest in the facility, and on-site inspections are used to assure compliance with the restriction just stated. Should a violation occur, the government is entitled to recover a share of the present value of the facility in the proportion which the federal grant bore to the original cost. After the 20-year period, the facility would be free of the restriction to secular use.

The Court in *Tilton* was divided 4–1–4. The plurality opinion sustaining the statute with a modification we will presently mention was written by the Chief Justice. The swing vote was provided by Mr. Justice White. In the plurality opinion, a fourfold test was stated:

Against this background we consider four questions: First, does the Act reflect a secular legislative purpose? Second, is the primary effect of the Act to advance or inhibit religion? Third, does the administration of the Act foster an excessive government entanglement with religion? Fourth, does the implementation of the Act inhibit the free exercise of religion? 403 *U. S.* at 678, 91 S. Ct. at 2095, 29 *L. Ed.* 2d at 799.

The plurality opinion found the legislative purpose was secular — to advance higher education in the public interest.

The opinion found, too, that the primary effect of the federal grant was not to advance religion. It noted the express legislative limitation that the subsidized facilities be devoted to the secular and not the religious function of the institution, and added that the record below established that the four church-related institutions which received the grants involved in the suit had abided by that limitation. In specific terms, the opinion stated the evidence was uncontradicted that "there had been no religious services or worship in the federally financed facilities, that there are no religious symbols or plaques in or on them, and that they had been used solely for nonreligious purposes." 403 *U. S.* at 680, 91 *S. Ct.* at 2096, 29 *L. Ed. 2d* at 800. The opinion rejected the proposition that in every church-related college, religion inevitably seeps into its secular activities, and found that assumption repelled by the record before it with respect to the four institutions. But the opinion found that since the usefulness of a facility could exceed the period of 20 years during which it was restricted against religious use, the statute improperly aided religion by permitting the facility to be used thereafter for a sectarian purpose. However, the 20-year limit was held to be severable, and accordingly that time limit upon the use restriction was excised.

Turning to the question of "excessive entanglement," held to be fatally present in *Lemon* and *DiCenso,* the plurality opinion found three factors "substantially diminish the extent and the potential danger of the entanglement." 403 *U. S.* at 685, 91 S. Ct. at 2099, 29 *L. Ed. 2d* at 803. The first was that, although parochial schools may be "an integral part of the religious mission of the Catholic Church" as the District Court said in *DiCenso,* the religious aspects of church-related institutions of higher learning differ significantly from those of parochial elementary and secondary schools. Whereas the "affirmative, if not dominant, policy" in pre-college church-schools is "to assure future adherents to a particular faith by having control of their total education at an early age," college students are less impressionable

and less susceptible to religious indoctrination. Further the very nature of college and postgraduate courses limits the opportunities for sectarian influence. The Court noted that many church-related colleges are characterized by a high degree of academic freedom, and found confirmation in the record concerning the four institutions there involved. Upon this basis, the opinion found "less likelihood than in primary and secondary schools that religion will permeate the area of secular education," and hence there is reduced, not only the risk that governmental aid will support religious activities, but also the need for intensive surveillance as to the use of the facility.

The second factor the plurality opinion found to diminish the likelihood of excessive entanglement was that the facilities were themselves inherently neutral as to religion, without the bias which could be exhibited by the teachers subsidized directly or indirectly in *Lemon* and *DiCenso*. And the final factor found to militate against the excessive entanglement of *Lemon* and *DiCenso* was that the federal statute provided for a one-time, single-purpose grant requiring only inspection as to use, a minimal contact, rather than continuing payments with annual audits and governmental analyses of an institution's expenditures on secular as distinguished from religious activities. Those three factors were found cumulatively to shape a relationship with "less potential for realizing the substantive evils against which the Religion Clauses were intended to protect" and to minimize "the potential for divisive religious fragmentation in the political arena." 403 *U. S.* at 688, 91 S. Ct. at 2100, 29 *L. Ed. 2d* at 804–805.

Turning to the fourth question, "does the implementation of the Act inhibit the free exercise of religion," the plurality opinion restated the issue to be whether the plaintiffs are compelled to pay taxes to support the program. The opinion found no "coercion directed at the practice or exercise of their religious beliefs," adding that the impact upon plaintiffs was fundamentally no different from the dollar impact

of the tax exemption sustained in *Walz* or the free loan of textbooks to private school students upheld in *Board of Education v. Allen*, 392 *U. S.* 236, 88 S. Ct. 1923, 20 *L. Ed. 2d* 1060 (1968).

Upon the foregoing analysis, the plurality opinion sustained the federal act, except so much as limited the religious-use restriction to a period of 20 years. In his swing opinion, Mr. Justice White agreed the 20-year limitation was invalid because of the residual value of the facility, but he found no violation of the establishment clause in the fact that the aid to the secular purpose might incidentally benefit the private or sectarian interests of the institution. As to entanglement, he found no evidence that there was in fact a blending of secular and sectarian education; and believing there was no reason to assume that government could not pursue its secular aim through educational institutions which also served sectarian educational interests (whether the level of instruction was primary, secondary, or higher), Mr. Justice White voted to uphold the federal, Pennsylvania, and Rhode Island statutes. He, however, added the following:

> As a postscript I should note that the Court decides both the federal and state cases on specified Establishment Clause considerations, without reaching the questions that would be presented if the evidence in any of these cases showed that any of the involved schools restricted entry on racial or religious grounds or required all students gaining admission to receive instruction in the tenets of a particular faith. For myself, if such proof were made, the legislation would to that extent be unconstitutional. 403 *U. S. at* 671, 91 S. Ct. at 2140, 29 *L. Ed. 2d* at 789, n. 2.

Since Mr. Justice White's vote was pivotal in *Tilton,* it follows that his postscript would be decisive in any case involving a grant to an institution of higher learning if either of the practices he described should appear.

For present purposes, we need not discuss at length the positions taken by the other members of the Court. In essence Mr. Justice Douglas, Mr. Justice Black, and Mr.

Justice Marshall (he did not sit in *Lemon*) found that any aid to the secular function must also improperly benefit the sectarian mission by freeing funds or facilities for the sectarian objective. They concluded also that the surveillance required under all the statutes must lead to a forbidden entanglement. Hence they agreed with the majority opinion in *Lemon* and *DiCenso* that the State statutes were invalid but dissented in *Tilton* from the judgment upholding the federal act. Mr. Justice Brennan, who was especially concerned with interference with the religious freedom of a beneficiary institution, found entanglement to be inevitable whenever the institution is sectarian. He agreed with the result in *Lemon* and *DiCenso*. In *Tilton* he voted to remand for a determination as to whether each institution is sectarian, *i. e.,* whether the propagation and advancement of a particular religion is a function or purpose of the institution.

### III

It is urged that we stay with our prior opinion. It is noted correctly that, as in *Tilton,* we are here concerned with higher education, and that, unlike *Tilton,* we are not dealing with "grants." Rather, as we have pointed out, the financing service, whether the security technique is a mortgage or a conveyance and leaseback, is simply a loan made by an Authority operating on a self-sustaining basis, available to a sectarian institution at the same rate applicable to a private secular institution. As already said, we likened this financing service to governmental sale of water or electricity or insurance coverage, as to which unquestionably business may be done with sectarian consumers, and indeed must be, since a denial of such service would probably inhibit religion.

It is quite true that the remand does not necessarily demonstrate disagreement with that approach. Only Mr. Justice Black voted to reverse, and it may be of some significance that neither Mr. Justice Douglas nor Mr. Justice Marshall joined Mr. Justice Black in that course, for if a loan made

by an agency operating on a self-sustaining basis were equal to an outright grant, their dissent in *Tilton* would unequivocally embrace our case. That they joined in a remand for reconsideration suggests a doubt somewhere, perhaps as to whether there is an element of forbidden aid or as to whether some aspect of the creditor-debtor or lessor-lessee arrangements involves a fatal entanglement, albeit of a kind not present in *Lemon* or *Tilton*. As to the plurality Justices in *Tilton*, their doubt may dwell upon whether some residual aid to religion would remain after the repayment of the loan if the facility is not permanently restricted to secular use. Perhaps they felt the borrower must pass the same muster which may be required by the plurality opinion of the recipient of an outright grant, as to which we will say more later on. Conceivably they were concerned also with possible entanglements of a creditor-debtor or a lessor-lessee relationship which were not involved under the outright grants in *Tilton*. Mr. Justice White may have entertained one or another of the doubts we have just mentioned. (Mr. Justice Brennan did not vote in our case.)

We cannot say we detect a precise message in the cryptic remand. This is understandable enough, for *Lemon* itself said that "Candor compels acknowledgment, moreover, that we can only dimly perceive the lines of demarcation in this extraordinarily sensitive area of constitutional law." 403 *U. S.* at 612, 91 S. Ct. at 2111, 29 *L. Ed. 2d* at 755. Nonetheless we are left with the feeling that a majority of the Supreme Court were not satisfied with our thesis that a loan under our statute is a wholly neutral transaction, devoid of a grant of a benefit and comparable to a governmental sale at cost of water or electricity or insurance coverage. We say this because that thesis is uncomplicated and is either accepted or rejected quite readily with little room for extended consideration. If the thesis were accepted, there of course would be no aid to religion. And on that thesis, there would be no problem as to entanglement; on the contrary, a refusal of such financing service to an otherwise qualified applicant be-

cause of its sectarian cast could well spark a claim that a denial of the service inhibits religion.

Of the four questions stated in *Tilton*, we need pursue only two facets: (1) whether a primary effect is impermissible aid to religion, and (2) whether excessive entanglement ensues. We think it clear the legislative purpose was secular, and we think it equally clear under *Tilton* that any impact upon the taxpayer (the statute appropriates some "seed" money, *L.* 1966, *c.* 106, § 36, *p.* 658) is too minimal to inhibit his exercise of religion. 403 *U. S.* at 689, 91 S. Ct. at 2101, 29 *L. Ed. 2d* at 805.

## IV

We will deal first with the question of entanglement.

■ Entanglement in education was mandated when it was unanimously held to be a constitutional right to seek secular instruction in sectarian halls. *Pierce v. Society of Sisters,* 268 *U. S.* 510, 45 S. Ct. 571, 69 *L. Ed.* 1070 (1925). It followed, in the view of *Pierce,* that "No question is raised concerning the power of the state reasonably to regulate all schools, to inspect, supervise and examine them, their teachers and pupils; to require * * * that teachers shall be of good moral character and patriotic disposition, that certain studies plainly essential to good citizenship must be taught, and that nothing be taught which is manifestly inimical to the public welfare." 268 *U. S.* at 534, 45 S. Ct. at 573, 69 *L. Ed.* at 1077. That is entanglement. Although *Pierce* dealt with compulsory education, its concept flows into higher education as well, for there too the State encounters the sectarian institution as the State deals with problems of accreditation and the protection of the public interest in baccalaureate degrees. See *Shelton College v. State Board of Education,* 48 *N. J.* 501 (1967).

With the increase in the cost of private education, pressure inevitably mounted for governmental contribution. Parents of private students, who of course must pay taxes to support public schools and chafe at the dual impost, employ

their political power for relief. They can say with *Pierce* that the private school, sectarian or secular, is meeting the State's need, and indeed the State's obligation in any jurisdiction, such as ours, in which the State Constitution calls for free public education. *Art.* VIII, § IV, ¶ 1. Without *Pierce,* there would not have been the busing in *Everson v. Board of Education,* 330 *U. S.* 1, 67 S. Ct. 504, 91 *L. Ed.* 711 (1947), or the loan without charge of school books in *Board of Education v. Allen, supra,* 392 *U. S.* 236, 88 S. Ct. 1923, 20 *L. Ed. 2d* 1060. And if the only private schools aided were the secular ones, a layman might feel it discriminatory that like aid is refused the sectarian school, which, on the hypothesis of *Pierce,* is doing the same effective secular job for the State. Parenthetically it may be added that the problem generated by *Pierce* is now aggravated by the impact of private schools upon efforts to end racial segregation in public schools.

We start then with the premise that there already is much entanglement. The question is not whether to introduce the phenomenon but how much more of it is tolerable.

We will deal with every conceivable area of possible entanglement in the setting before us. The first possibility is that the very act of deciding whether a practice or a use is sectarian is excessively entangling. Little need be said to dissipate that objection. As pointed out in *Walz v. Tax Commission,* 397 *U. S.* 664, 670, 90 S. Ct. 1409, 1412, 25 *L. Ed. 2d* 697, 702 (1970), that kind of involvement is inherent in all enforcement of the church-state provision. It is commonplace, for example in disputes over exemptions from taxation. It of course was present in *Lemon, DiCenso,* and *Tilton,* and no member of the Court suggested the statutes ran afoul of the Constitution merely because they projected the question of what is sectarian.

The next conceivable objection is that a loan, whether secured by a mortgage or by a conveyance-leaseback arrangement, involves excessive entanglement because of the chance

of litigation to enforce the terms of the mortgage or lease.[3] That feature was not involved in *Tilton* since *Tilton* involved outright grants, although even there a suit would lie to recover the grant or a part if the facility should be used for sectarian purposes. Again no member of the Court in that case mentioned such a suit as possibly entangling.

In *Walz,* it was held that the exemption from *ad valorem* taxation of property used for religious purposes did not offend the church-state provision. The majority opinion pointed out that "Either course, taxation of churches or exemption, occasions some degree of involvement with religion" and followed that statement with the observation that "Elimination of exemption would tend to expand the involvement of government by giving rise to tax valuation of church property, tax liens, tax foreclosures, and the direct confrontations and conflicts that follow in the train of those legal processes." 397 *U. S.* at 674, 90 S. Ct. at 1414, 25 *L. Ed. 2d* at 704–705. But no member of the Supreme Court suggested the church-state provision compels exemption from taxation because enforcement of a lien would itself be too entangling in the constitutional sense. Litigation is quite common with respect to whether church-owned property is used for church purposes within the meaning of an exempting statute, and when other church-owned property is taxed, it of course becomes subject to foreclosure for nonpayment. And, we may add, churches are amenable to suit by private litigants so long as spiritual matters or church doctrine are not the subjects of the controversy. *Baugh v. Thomas,* 56 *N. J.* 203 (1970).

Our earlier opinion dealt only with two types of transactions: a loan secured by a conventional mortgage, and a loan, in substance, secured by a conveyance of land by the borrower and a leaseback of the property improved with the

---

[3] These transactions of course involve a continuing relation with possible disputes with respect to compliance with sundry covenants. Nonetheless, it is doubtful that government, in leasing its surplus space, could exclude a sectarian bidder.

facility. It is now suggested that *N. J. S. A.* 18A:72A–34(a) and 18A:72A–5(k) contemplate a third transaction, whereby the Authority will itself operate and manage a project rather than lease it to the participating college. We are told the Authority has no such transaction in mind, and it is urged, and we think correctly, that we should not decide whether such operation and management might entail excessive entanglement. At the moment, the question is too hypothetical and unparticularized for meaningful consideration. We add that, should that portion of the statute fall, the remainder would survive.

The final possible entanglement arises out of the statutory provision that an "educational facility" shall not include "any facility used or to be used for sectarian instruction or as a place of religious worship." We see no difficulty, since this restriction involves the same kind of surveillance required under the federal statute upheld in *Tilton*.

We accordingly conclude that the statute cannot be struck down on the thesis of excessive entanglement with religion.

## V

The next question is whether a primary effect of the statute is to aid religion. For reasons already given, we start with the premise that the Supreme Court would find the loan transaction confers a benefit within the reach of the church-state provision even though the lending Authority is self-sustaining and the recipient pays the total cost to the Authority of the moneys loaned. Two consequences follow from that premise.

The first is that the facility may never be used for sectarian purposes. Our statute can be construed to meet that demand. As already noted, *N. J. S. A.* 18A:72A–3, in its definition of an educational facility, provides that it shall not include any facility "used or to be used for sectarian instruction or as a place for religious worship." The words "to be used" can be read to satisfy this constitutional re-

quirement. Hence they will be so read. The restriction will remain enforceable by suit even after the mortgage is cancelled or the leaseback property is reconveyed to the institution.

The second consequence is that operational policies of the participating college may be relevant even though the facility itself is not used for a sectarian purpose. Since Mr. Justice White's concurrence in *Tilton* was pivotal, we can easily say on the basis of the postscript to his opinion, quoted above, that he would join the dissenters in *Tilton* in striking down a transaction with an institution which "restricted entry on racial or religious grounds or required all students gaining admission to receive instruction in the tenets of a particular faith." 403 *U. S.* at 671, 91 S. Ct. at 2140, 29 *L. Ed. 2d* at 789, n. 2.

We cannot tell whether the plurality members of the Court would accept Mr. Justice White's postscript or go beyond it. As to this, the plurality opinion reads:

Rather than focus on the four defendant colleges and universities involved in this case, however, appellants seek to shift our attention to a 'composite profile' that they have constructed of the 'typical sectarian' institution of higher education. We are told that such a 'composite' institution imposes religious restrictions on admissions, requires attendance at religious activities, compels obedience to the doctrines and dogmas of the faith, requires instruction in theology and doctrine, and does everything it can to propagate a particular religion. Perhaps some church-related schools fit the pattern that appellants describe. Indeed, some colleges have been declared ineligible for aid by the authorities that administer the Act. But appellants do not contend that these four institutions fall within this category. Individual projects can be properly evaluated if and when challenges arise with respect to particular recipients and some evidence is then presented to show that the institution does in fact possess these characteristics. We cannot, however, strike down an Act of Congress on the basis of a hypothetical 'profile.' 403 *U. S.* at 682, 91 S. Ct. at 2097, 29 *L. Ed. 2d* at 801.

It would be idle for us to attempt to anticipate where the plurality will go in this regard, for there is no clue. Nor would our prediction be at all helpful. Our statute con-

templates the sale of bonds for each project. No assurance from us could allay a purchaser's concern in a particular transaction. Until more light is shed by the Supreme Court, the operation of the statute will probably be contained by practical considerations whenever the "profile" or its specter appears. Thus the constitutional stricture may in fact restrain beyond its true limits so long as those limits are obscure, but realistically we cannot help in that regard. We are, however, satisfied that whatever the constitutional bar as to church-related institutions, the balance of the statute will remain viable.

To sum up, we conclude that (1) the statute is valid; (2) a facility may not "be used for sectarian instruction or as a place for religious worship" even after the Authority is fully repaid; (3) no college may participate if it restricts "entry on racial or religious grounds" or requires "all students gaining admission to receive instruction in the tenets of a particular faith"; (4) we are unable to say whether other religious precepts or practices, unrelated to the immediate use of the facility, will also disqualify a college; and (5) the disqualification of colleges because of (3) or (4) will not affect the continued validity of the statute.

*For reversal and remandment*—Chief Justice WEINTRAUB and Justices JACOBS, PROCTOR, HALL, SCHETTINO and MOUNTAIN—6.

*For affirmance*—None.