[S.F. No. 23148. In Bank. Sept. 25, 1974.]

CALIFORNIA EDUCATIONAL FACILITIES AUTHORITY et al.,
Petitioners, v.
IVY BAKER PRIEST, as Treasurer, etc., Respondent.

594

**COUNSEL**

Gordon D. Schaber, Donald R. Prinz, John R. Lewis and Orrick, Herrington, Rowley & Sutcliffe for Petitioners.

Mackay, McGregor & Bennion, Adam Y. Bennion, McCutchen, Doyle, Brown & Enersen, Albert J. Moorman, Jr., Musick, Peeler & Garrett, James E. Ludlam, Robert D. Girard and Gerald G. Kelly as Amici Curiae on behalf of Petitioners.

Evelle J. Younger, Attorney General, and Walter J. Wiesner, Deputy Attorney General, for Respondent.

## Opinion

MOSK, J.—Petitioners California Educational Facilities Authority (here-inafter called "the Authority") and University of the Pacific seek an orig-inal writ of mandate to compel respondent state Treasurer to prepare to sell certain bonds authorized by the California Educational Facilities Authority Act (Ed. Code, § 30301 et seq., added by Stats. 1972, ch. 1432, § 1, p. 3127, hereinafter called "the Act"). Respondent declines to take the steps necessary to sell the bonds because serious questions have been raised as to the constitutionality of the Act. We conclude the Act is valid and that a peremptory writ should issue as prayed.

The Act here challenged established the Authority as "a public instru-mentality" performing "an essential public function" (§ 30304, subd. (a)),[1] to wit, the issuance of revenue bonds for the purpose of "providing private institutions of higher education within the state an additional means by which to expand, enlarge, and establish dormitory, academic, and related facilities, to finance such facilities, and to refinance existing facilities." (§ 30301.) Under the terms of the Act, the Authority may use the pro-ceeds generated by its bond sales to construct or rehabilitate dormitories and other educational facilities at participating private colleges and univer-sities. (§ 30310.) Such projects may include a wide variety of facilities suitable for academic and extracurricular use,[2] but "shall not include any facility used or to be used for sectarian instruction or as a place for reli-gious worship or any facility used or to be used primarily in connection with any part of the program of a school or department of divinity." (§ 30303.) To participate with the Authority in the financing, construc-tion, or acquisition of a project under the Act, a private college or univer-sity must be a nonprofit institution of higher education which "neither restricts entry on racial or religious grounds nor requires all students gain-ing admission to receive instruction in the tenets of a particular faith . . . ." (Ibid.)

The Authority may acquire land and other property necessary for any project by purchase or otherwise, and may construct or rehabilitate a

[1]Unless otherwise indicated, all statutory references herein are to the Education Code.

[2]The term "educational facility" means "a structure suitable for use as a dor-mitory, dining hall, student union, administration building, academic building, library, laboratory, research facility, classroom, health care facility . . ., and parking, main-tenance, storage or utility facility and other structures or facilities related thereto or required or useful for the instruction of students or the conducting of research or the operation of an institution for higher education, and the necessary and usual attend-ant and related facilities and equipment . . ." (§ 30303.)

project on land conveyed to it by a participating college.[3] The Authority is accorded broad supervisory powers over a project that it builds or repairs at a participating college, including the right to determine the location and character of the project; to prepare plans and estimates, and hire architects, contractors, and superintendents; to establish regulations for the use of the project; and to fix and collect the fees or rents to be charged for the services furnished by the project. (§ 30310; see also § 30316.)

The Authority is also empowered to lease to the participating college any project which it builds or repairs. When the liabilities of the Authority for any leased project have been met and the bonds of the Authority issued therefore have been paid, the Authority must transfer title to all real and personal property of the project to the participating college. (§ 30328.) Finally, the Authority is empowered to make loans to the participating college for the construction of projects approved by the Authority. (§ 30329.)

The Act does not give the Authority any power to tax or to appropriate or expend public funds. The bonds issued under the Act are the obligation of the Authority alone. The Act expressly provides that the bonds shall not be deemed to constitute a debt or liability of the state or a pledge of the state's faith and credit. (§ 30315; see also § 30335.) The bonds and the interest thereon will be paid by the participating colleges out of revenues flowing from the projects. (§ 30316, subd. (b).) Moreover, the Authority has the power to apportion its administrative expenses among the participating colleges. (§ 30310, subd. (p).) Thus no general revenues of the state will be required to sustain the Authority.

In essence, therefore, the Act creates the Authority as a self-supporting mechanism through which private colleges may obtain financing for educational facilities at a lower rate of interest than would otherwise be available through conventional private financing sources. The reduced interest rate results from the Authority's power, as a public instrumentality, to issue tax-exempt bonds.[4] The tax-exempt status of the bonds permits them to be marketed at a significantly lower interest rate than bonds issued by nonexempt concerns. In turn, this reduces the cost of financing any projects built or acquired with the proceeds of such bonds.

---

[3]Whenever reference herein is made to "college," the term embraces university as well. The Act draws no distinction among types of institutions of higher education. (§ 30303.)

[4]Interest payments on the Authority's bonds are exempted from state and local taxation by section 30324. Such interest payments are also exempted from federal income taxation by section 103 of the Internal Revenue Code. (26 U.S.C. § 103 (a)(1).)

Pursuant to the Act, the Authority approved a resolution indicating its intent to issue bonds to finance educational facilities for petitioner University of the Pacific, a "participating college." The Authority then requested that respondent state Treasurer fulfill her statutory duty to prepare to issue the subject bonds. Respondent refused to act, questioning the validity of the Act in light of various provisions of the United States and California Constitutions.

At the outset we note that the writ of mandate will lie to compel a governmental official to perform a ministerial act such as the issuance of bonds; and in a proceeding brought for that purpose, the validity of the law authorizing such issuance may be determined. (*Metropolitan Water Dist.* v. *Marquardt* (1963) 59 Cal.2d 159, 170-171 [28 Cal.Rptr. 724, 379 P.2d 28], and cases cited.) **(2)** This court will exercise its original jurisdiction to grant such a writ (Cal. Const., art. VI, § 10) when "the issues presented are of great public importance and must be resolved promptly." (*County of Sacramento* v. *Hickman* (1967) 66 Cal.2d 841, 845 [59 Cal.Rptr. 609, 428 P.2d 593]; accord, *San Francisco Unified School Dist.* v. *Johnson* (1971) 3 Cal.3d 937, 944-945 [92 Cal.Rptr. 309, 479 P.2d 669].) The questions presented in the case at bar are manifestly of considerable statewide significance. The maintenance and improvement of facilities for higher education is of clear public concern. (See *University of So. California* v. *Robbins* (1934) 1 Cal.App.2d 523, 528, 530 [37 P.2d 163].) Moreover, a challenge to the validity of an elaborate new statutory program designed to assist institutions of higher education in preserving and expanding their facilities is a matter which deserves prompt judicial attention.

Turning to the merits, we first address respondent's contention that the implementation of the Act will result in furnishing state aid to sectarian institutions of higher education in violation of the establishment clause of the First Amendment to the United States Constitution, and related provisions of the California Constitution (art. I, § 4; art. IX, § 8; art. XIII, § 24).[5]

---

[5]Petitioner University of the Pacific is not affiliated with any religious organization, and therefore is not directly concerned with a challenge to the validity of the Act under the constitutional provisions barring state aid to sectarian organizations and schools. However, the Association of Independent California Colleges and Universities, an amicus curiae in this proceeding, represents 53 independent accredited institutions of higher education in California, a number of which have denominational ties and have made preliminary applications to the Authority for assistance in financing projects under the Act. If we were to decline to reach the First Amendment issue now it would surely arise again as a consequence of such applications, and a cloud would remain over the Act until it was resolved. The issue, moreover, has been fully briefed, both by the parties and by the amicus curiae. In these circumstances we deem it appropriate to decide the question in the present proceeding.

The First Amendment to the United States Constitution provides in pertinent part: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; . . ."[6] Although the establishment clause was originally "intended to erect 'a wall of separation between church and State' " (*Everson* v. *Board of Education* (1947) 330 U.S. 1, 16 [91 L.Ed. 711, 723-724, 67 S.Ct. 504, 168 A.L.R. 1392]),[7] the United States Supreme Court acknowledges that an absolute "sanitized separation" cannot be achieved. (*Committee for Public Education* v. *Nyquist* (1973) *supra,* 413 U.S. 756, 760 [37 L.Ed.2d 948, 955-956]; *Lemon* v. *Kurtzman* (1971) 403 U.S. 602, 614 [29 L.Ed.2d 745, 756-757, 91 S.Ct. 2105].) The Supreme Court recognizes its inability to perceive with invariable clarity "the lines of demarcation in this extraordinarily sensitive area of constitutional law" (*Lemon* v. *Kurtzman* (1971) *supra,* 403 U.S. 602, 612 [29 L.Ed.2d 745, 755]), and concedes that today the "line of separation, far from being a 'wall,' is a blurred, indistinct, and variable barrier depending on all the circumstances of a particular relationship." (*Id.* at p. 614 [29 L.Ed.2d at pp. 756-757]; accord, *Committee for Public Education* v. *Nyquist* (1973) *supra,* 413 U.S. 756, 761, fn. 5 [37 L.Ed.2d 948, 956].)

In reviewing a law attacked on establishment grounds the Supreme Court seeks to ascertain whether the enactment furthers any of the primary evils which the clause was intended to forestall, i.e., the " 'sponsorship, financial support, and active involvement of the sovereign in religious activity.' " (*Committee for Public Education* v. *Nyquist* (1973) *supra,* 413 U.S. 756, 772 [37 L.Ed.2d 948, 962], quoting from *Walz* v. *Tax Commission* (1970) 397 U.S. 664, 668 [25 L.Ed.2d 697, 701, 90 S.Ct. 1409].) In this regard, the court has determined that an enactment may be a "law respecting an establishment of religion" even though in effect it does not promote a "state religion." (*Lemon* v. *Kurtzman* (1971) *supra,* 403 U.S. 602, 612.) Moreover, a law may violate the clause by aiding all religions, not

---

[6]The provisions of the First Amendment are binding on the states through the due process clause of the Fourteenth Amendment. (*Committee for Public Education* v. *Nyquist* (1973) 413 U.S. 756, 760, fn. 3 [37 L.Ed.2d 948, 955-956, 93 S.Ct. 2955].) There is no claim in this case that the challenged statute violates the free exercise clause of the First Amendment, except insofar as the United States Supreme Court's approach to cases involving the religion clauses represents an interaction between the two. (*Hunt* v. *McNair* (1973) 413 U.S. 734, 736, fn. 1 [37 L.Ed.2d 923, 927, 93 S.Ct. 2868].)

[7]The history of the establishment clause has been frequently related and need not be repeated here. (See, e.g., *Committee for Public Education* v. *Nyquist* (1973) *supra,* 413 U.S. 756, 770-771, fn. 28 [37 L.Ed.2d 948; 961-962]; *Everson* v. *Board of Education* (1947) *supra,* 330 U.S. 1, 9-14; *id.* at pp. 33-43 [91 L.Ed. 711, 720-723; *id.* at pp. 732-737] (Rutledge, J., dissenting).)

only by preferring one sect or religion over another. (*Everson* v. *Board of Education* (1947) *supra,* 330 U.S. 1, 15 [91 L.Ed. 711, 723].) However, recognizing that in complex modern society some interaction between government and religious organizations is inevitable, the court has determined that a law which confers indirect, remote, or incidental benefits upon religious institutions is not, for that reason alone, constitutionally defective. (*Committee for Public Education* v. *Nyquist* (1973) *supra,* 413 U.S. 756, 771-772 [37 L.Ed.2d 948, 961-962], and cases cited.)

██ Emerging from the cases is a tripartite test which governs judicial consideration of challenges to laws as violative of the establishment clause. To be valid, the statute must first have a clearly secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; and third, the statute must not foster an excessive government entanglement with religion. (*Committee for Public Education* v. *Nyquist* (1973) *supra,* 413 U.S. 756, 772-773 [37 L.Ed.2d 948, 962-963]; *Hunt* v. *McNair* (1973) *supra,* 413 U.S. 734, 741 [37 L.Ed.2d 923, 930]; *Lemon* v. *Kurtzman* (1971) *supra,* 403 U.S. 602, 612-613 [29 L.Ed.2d 745, 755-756].)

Applying these tests in *Hunt* v. *McNair* (1973) *supra,* 413 U.S. 734, the Supreme Court upheld a South Carolina statute identical in all pertinent respects to the Act now before us. In *Hunt,* the South Carolina Educational Facilities Act was challenged as violative of the establishment clause insofar as it authorized that state's educational facilities authority to issue revenue bonds for the financing and refinancing of capital improvements at a Baptist-controlled private college. The college was to convey a portion of its campus to the authority without cost, and the authority would lease the property back to the college; after payment in full of the bonds issued to finance the project, the authority would reconvey the project to the college. The Supreme Court ruled that the purpose of the challenged statute was secular, that the statute as applied in the proposed scheme did not have the primary effect of advancing religion, and that the statute and the proposal did not foreshadow excessive entanglement of the state with religion. (*Id.* at pp. 741-749 [37 L.Ed.2d at pp. 930-935].)

██ The decision in *Hunt* compels us to hold that the Act here challenged withstands scrutiny under the federal establishment clause. First, the legislative purpose of the Act is manifestly secular, i.e., "to give this and future generations of youth the fullest opportunity to learn and develop their intellectual and mental capacities by providing private institutions of higher education within the state an additional means by which to

expand, enlarge, and establish dormitory, academic, and related facilities, . . ." (§ 30301.) The benefits of the Act are available to all nonpublic institutions of higher education in the state, whether sectarian or nonsectarian. The objective of providing expanded opportunities for college education is a legitimate secular goal appropriate for governmental action. (*Tilton* v. *Richardson* (1971) 403 U.S. 672, 679 [29 L.Ed.2d 790, 799-800, 91 S.Ct. 2091]; see also *University of So. California* v. *Robbins* (1934) *supra,* 1 Cal.App.2d 523, 528, 530; *Veterans' Welfare Board* v. *Riley* (1922) 189 Cal. 159, 168 [208 P. 678, 22 A.L.R. 1531].) The significant contribution of private schools to providing such educational opportunities is well recognized. (*Board of Education* v. *Allen* (1968) 392 U.S. 236, 247-248 [20 L.Ed.2d 1060, 1067-1068, 88 S.Ct. 1923].)

Second, in evaluating the "primary effect" of the legislation in *Hunt,* the court reiterated its prior rejection of the argument, also advanced by respondent here, that all governmental assistance to a sectarian organization is forbidden under the establishment clause "because aid to one aspect of an institution frees it to spend its other resources on religious ends." (413 U.S. at p. 743 [37 L.Ed.2d at p. 931].) Rather, a state may constitutionally "provide church-related schools with secular, neutral, or nonideological services, facilities, or materials." (*Lemon* v. *Kurtzman* (1971) *supra,* 403 U.S. 602, 616 [29 L.Ed.2d 745, 757-758].) The test declared in *Hunt* is that "Aid normally may be thought to have a primary effect of advancing religion when it flows to an institution in which religion is so pervasive that a substantial portion of its functions are subsumed in the religious mission or when it funds a specifically religious activity in an otherwise substantially secular setting." (413 U.S. at p. 743 [37 L.Ed.2d at p. 931].)

There can be no claim in the instant case that the proposed project runs afoul of this test. As noted, the University of the Pacific is not affiliated with any religious organization. But even if it were, neither the Act nor the proposed project would have the impermissible primary effect of advancing religion. As we have seen, the Act contains an explicit limitation that participating colleges may neither restrict entry on racial or religious grounds nor require students gaining admission to receive instruction in the tenets of a particular faith. (§ 30303.) Moreover, the Act prohibits the Authority from constructing or funding any project to be used "for sectarian instruction" or "as a place for religious worship" or "primarily in connection with any part of the program of a school or department of divinity." (*Ibid.*) There is no showing that the proposed project violates these restrictions. ■ ■ Similar provisions in *Hunt* satisfied the

high court that such a statute would not have the primary effect of advancing religion. (413 U.S. at pp. 744-745 [37 L.Ed.2d at pp. 931,-932].)[8]

Third, in gauging whether the statute and proposal examined in *Hunt* involved the state in an "excessive entanglement" with religion, the court considered both the extent to which religion permeated the institution in question and the degree of state involvement in the day-to-day financial and policy decisions of that institution. The court determined that the right of the state authority to *inspect* projects at church-related colleges to insure the projects were not used for religious purposes did not entail such excessive entanglement. (413 U.S. at p. 746 [37 L.Ed.2d at p. 933].) In the case at bar we similarly believe that the power of the Authority to make periodic inspections of projects at participating colleges to insure compliance with restrictions prohibiting sectarian use is permissible.

The court in *Hunt* further noted that the statutory powers of the state agency to fix and collect rents or fees for the use of a project and to establish rules and regulations for its use might create significant entanglement problems if there were a realistic likelihood that such powers would be "exercised in their full detail." (*Id.* at p. 747 [37 L.Ed.2d at p. 933].) But the court determined that such entanglement was not probable, construing the lease agreement between the state authority and the college to "place on the College the responsibility for making the detailed decisions regarding the government of the campus and the fees to be charged for particular services." (*Id.* at p. 748 [37 L.Ed.2d at p. 934].) Here, too, the Act confers upon the Authority broad powers over a project that it builds or acquires at a participating college. However, the Act also provides that when the Authority *leases* a project to a private college, "the lessee shall be responsible for the direct operation and maintenance costs of such project and, in addition, shall be responsible for the overall supervision of each project . . . ." (§ 30332, subd. (a).) And when the Authority makes *loans* to a private college for the construction of a project, the col-

---

[8]Of course, if the Authority were to exercise its powers in aid of an institution which is pervasively sectarian within the meaning of the *Hunt* test, a different conclusion might be compelled. "Individual projects can be properly evaluated if and when challenges arise with respect to particular recipients and some evidence is then presented to show that the institution does in fact possess these [disqualifying] characteristics." (*Tilton* v. *Richardson* (1971) *supra,* 403 U.S. 672, 682 [29 L.Ed.2d 790, 801].) We emphasize, however, that the fact an institution of higher education is affiliated with or governed by a religious organization is insufficient, without more, to establish that aid to that institution impermissibly advances religion. (See *Hunt* v. *McNair* (1973) *supra,* 413 U.S. 734, 743 [37 L.Ed.2d 923, 931]; *Tilton* v. *Richardson* (1971) *supra,* 403 U.S. 672, 686-687 [29 L.Ed.2d 790, 803-804].)

lege is likewise responsible for "overall supervision" as well as "direct operation and maintenance costs." (§ 30332, subd. (b).) Thus, as in *Hunt,* the Authority in such circumstances is not unnecessarily involved in the day-to-day administration of the participating college.[9]

■ We further hold that neither the Act nor the proposed bond issuance violates the several California constitutional provisions prohibiting state aid for sectarian purposes.[10]

Article I, section 4, of the California Constitution provides in pertinent part: "The free exercise and enjoyment of religious profession and worship, without discrimination or preference, shall forever be guaranteed in this State; . . ." The challenged measure is not violative of this constitutional provision. The Act is religiously neutral; it neither favors, fosters, nor establishes any religion; nor does it in any way, directly or indirectly, infringe upon the free exercise rights of the people of this state.

Article IX, section 8, of the California Constitution provides in pertinent part: "No public money shall ever be appropriated for the support of any sectarian or denominational school, or any school not under the exclusive control of the officers of the public schools; . . ." The Act, however, does not require the outlay or appropriation of public money. Here, as in *Hunt,* "The 'state aid' involved in this case is of a very special sort. We have here no expenditure of public funds, either by grant or loan, no reimbursement by a State for expenditures made by a parochial school or college, and no extending or committing of a State's credit." (413 U.S. at p. 745, fn. 7 [37 L.Ed.2d at p. 932].) The bonds issued by the Authority will be repaid from revenues generated by the projects themselves. And as noted earlier, even

---

[9]Significant entanglement problems might be presented under *Hunt* if the Authority chose to *operate* and *manage* a project at a religiously affiliated college rather than leasing or selling the project to such institution. That situation, however, is not now before us.

[10]It is noteworthy that the highest courts of a number of our sister states have upheld the validity of statutes similar to the Act before us. In several cases, the challenged statute withstood scrutiny in light of state constitutional provisions similar to our own prohibiting aid to sectarian organizations and schools. (*Cecrle* v. *Educational Facilities Authority* (1972) 52 Ill.2d 312 [288 N.Ed.2d 399]; *Opinion of the Justices* (1968) 354 Mass. 779 [236 N.E.2d 523]; see also *Vermont Educational Buildings Financ. Ag.* v. *Mann* (1968) 127 Vt. 262 [247 A.2d 68], app. dism., 396 U.S. 801 [24 L.Ed.2d 58, 90 S.Ct. 9]; *Nohrr* v. *Brevard County Educational Fac. Auth.* (Fla. 1971) 247 So.2d 304; *Clayton* v. *Kervick* (1970) 56 N.J. 523 [267 A.2d 503], vacated 403 U.S. 945 [29 L.Ed.2d 854, 91 S.Ct. 2274, 2275], affd. on remand (1971) 59 N.J. 583 [285 A.2d 11]; *Hunt* v. *McNair* (1970) 255 S.C. 71 [177 S.E.2d 362], vacated 403 U.S. 945 [29 L.Ed.2d 854, 91 S.Ct. 2276], affd. on remand 258 S.C. 97 [187 S.E.2d 645], affd. (1973) 413 U.S. 734 [37 L.Ed.2d 923, 93 S.Ct. 2868]; *In re Opinion of the Justices* (1955) 99 N.H. 536 [114 A.2d 801].)

the operating expenses of the Authority are to be borne by the participating colleges.

Respondent argues that the time spent by the public officials who serve on the Authority without compensation (§ 30304, subd. (d)) constitutes an appropriation in violation of article IX, section 8, insofar as their public salaries benefit the private institutions assisted by the Authority.[11] This contention is without merit. Many other officials on the public payroll have occasion to spend some portion of their working time processing applications by sectarian schools, relating to such matters as incorporation, tax exemption, zoning, health and safety inspections, building permits, and parking regulations; and, of course, fire and police protection is provided personnel and property of private as well as public institutions. Such indirect and incidental "benefits" do not violate article IX, section 8. (*Bowker* v. *Baker* (1946) 73 Cal.App.2d 653, 666 [167 P.2d 256]; *Gordon* v. *Board of Education* (1947) 78 Cal.App.2d 464, 475-476 [178 P.2d 488].)

■ Article XIII, section 24, of the California Constitution provides in pertinent part: "Neither the Legislature, nor any county, . . . or other municipal corporation, shall ever make an appropriation, or pay from any public fund whatever, or grant anything to or in aid of any religious sect, church, creed, or sectarian purpose, or help to support or sustain any school, college, university, . . . controlled by any religious creed, church, or sectarian denomination whatever; . . ."

This section has been said to constitute "the definitive statement of the principle of government impartiality in the field of religion." (37 Ops.Cal. Atty.Gen. 105, 107 (1961).) An examination of the debates of the constitutional convention which drafted the Constitution of 1879 indicates that the provision was intended to insure the separation of church and state and to guarantee that the power, authority, and financial resources of the government shall never be devoted to the advancement or support of religious or sectarian purposes. (*Gordon* v. *Board of Education* (1947) *supra*, 78 Cal.App.2d 464, 472-473.) Under this section, the fact that a statute has some identifiable secular objective will not immunize it from further analysis to ascertain whether it also has the direct, immediate, and substantial effect of advancing religion. Thus, in *Frohliger* v. *Richardson* (1923) 63 Cal.App. 209, 217 [218 P. 497], the court struck down a statute appropriating money for the restoration of the San Diego Mission although it conceded that secular—i.e., historical and cultural—as well as religious ends

---

[11]The Authority is composed of three state officers—the Treasurer, the Controller, and the Director of Finance—and two representatives of educational institutions appointed by the Governor. (§ 30304, subd. (b).)

were served by the enactment. (See also *County of Los Angeles* v. *Hollinger* (1963) 221 Cal.App.2d 154 [34 Cal.Rptr. 387] (religious Christmas parade); 37 Ops.Cal.Atty.Gen. 105 (1961) (religious public play).)

██ The section has never been interpreted, however, to require governmental hostility to religion, nor to prohibit a religious institution from receiving an indirect, remote, and incidental benefit from a statute which has a secular primary purpose. (See, e.g., *Lundberg* v. *County of Alameda* (1956) 46 Cal.2d 644 [298 P.2d 1], upholding tax exemption for parochial primary and secondary schools.) In *Bowker* v. *Baker* (1946) *supra,* 73 Cal.App.2d 653, 666, the court recognized that "many expenditures of public money give indirect and incidental benefit to denominational schools and institutions of higher learning. Sidewalks, streets, roads, highways, sewers are furnished for the use of all citizens regardless of religious belief. . . . Police and fire departments give the same protection to denominational institutions that they give to privately owned property and their expenses are paid from public funds."

The Act here challenged clearly provides a "benefit" in that it enables sectarian institutions to borrow money through the use of a state instrumentality at a cost below that of the marketplace. ██ ██ ██ Thus the crucial question is not whether the Act provides such a benefit, but whether that benefit is incidental to a primary public purpose.[12] **(6c)** The framers of the Constitution recognized the importance of education in our social fabric, and imposed a constitutional duty on the Legislature to "encourage by all suitable means the promotion of intellectual . . . improvement." (Art. IX, § 1.) The present law is responsive to that mandate. The Legislature has expressly determined that the Act, in supporting the maintenance and improvement of facilities for higher education, is in the public interest (§§ 30301, 30324, 30334), and that determination

---

[12]Petitioners and amici curiae suggest that article XIII, section 24, prohibits only the direct appropriation and expenditure of public *funds* in support of sectarian organizations and purposes. Accordingly, they contend the reach of this section does not extend to the Act, which provides no direct financial support and requires no actual outlay of public money. We do not read section 24 so narrowly. Its terms forbid granting "anything" to or in aid of sectarian purposes, and prohibit public help to "support or sustain" a sectarian-controlled school. The section thus forbids more than the appropriation or payment of public funds to support sectarian institutions. It bans any official involvement, whatever its form, which has the direct, immediate, and substantial effect of promoting religious purposes. The United States Supreme Court has also forbidden sectarian aid other than direct public expenditures, focusing not on the form of the aid but on its "substantive impact." (*Committee for Public Education* v. *Nyquist* (1973) *supra,* 413 U.S. 756, 786 [37 L.Ed.2d 948, 970]; see also *Hunt* v. *McNair* (1973) *supra,* 413 U.S. 734, 754-755 [37 L.Ed.2d 923, 937-938]. and cases cited (dissenting opn. by Brennan, J.).)

is entitled to great deference. (*Veterans' Welfare Board* v. *Riley* (1922) *supra,* 189 Cal. 159, 168; see also *University of So. California* v. *Robbins* (1934) *supra,* 1 Cal.App.2d 523, 528.) The benefits of the Act are granted to sectarian and nonsectarian colleges on an equal basis; in both cases all aid for religious projects is strictly prohibited; and in no event is a financial burden imposed upon the state. In these circumstances the Act does not have a substantial effect of supporting religious activities. Rather, its primary purpose is to advance legitimate public ends, and it therefore does not violate article XIII, section 24.

In sum, although in certain subtle respects the Act appears to approach state involvement with religion (*Everson* v. *Board of Education* (1947) *supra,* 330 U.S. 1, 16 [91 L.Ed. 711, 723-724]), we cannot say that in the abstract it crosses the forbidden line.

Other constitutional objections to this legislation are clearly untenable. Respondent contends the Act contravenes article XIII, section 21, of the California Constitution, which prohibits the gift of public money for the benefit of private organizations.[13] Nothing in the Act empowers the Authority to appropriate money or to grant or donate any public property to such organizations. Respondent's assertion that the section prohibits the appropriation of public funds to pay the salaries of the state officials who serve on the Authority is no more persuasive than the argument, rejected hereinabove, that such salaries violate article IX, section 8. Respondent's concern that the state might appropriate funds at some future date to pay off bonds in default is purely speculative; the Act authorizes no such appropriation or legislation, and we need not now consider this remote possibility.

It is urged that the Act violates article XIII, section 25, of the California Constitution, which prohibits the Legislature from lending or pledging the credit of the state for the payment of any liability of any individual or corporation. As noted earlier, however, the Act specifically declares that the bonds issued by the Authority shall not "constitute a debt or liability of the state or of any political subdivision thereof or a pledge of the faith and credit of the state or of any such political subdivision . . . ." (§ 30315; see also § 30335.) Indeed, each bond must contain a statement on its face to the effect that "neither the faith and credit nor the taxing power of the State of California or of any political subdivision thereof is pledged to the payment of the principal of or the interest on" such bond. (§ 30315.)

---

[13]Article XIII, section 21, of the Constitution provides in pertinent part: "No money shall ever be appropriated or drawn from the State Treasury for the purpose or benefit of any corporation, association, . . . or any other institution not under the exclusive management and control of the state as a state institution, nor shall any grant or donation of property ever be made thereto by the State . . . ."

Respondent argues that the Act violates article XVI, section 1, of the California Constitution, which prescribes the manner in which the Legislature may create debts or liabilities. However, such indebtedness or liability refers only to legally enforceable obligations against the state's general funds or taxing power. (Cf. *City of Oxnard* v. *Dale* (1955) 45 Cal.2d 729, 735-736 [290 P.2d 859].) The section has no application to the bonds and obligations of the Authority, which are to be repaid solely by the participating colleges and expressly create no state debt. (See *In re California Toll Bridge Authority* (1931) 212 Cal. 298, 302 [298 P. 485].)

█ Finally, respondent points to a specific constitutional amendment authorizing the Legislature to issue bonds to finance the acquisition, construction, and installation of environmental pollution control facilities. (Art. XVI, § 14, adopted in 1972.) However, the enactment of this amendment in no way necessitates a similar constitutional amendment authorizing the present Act.

We conclude the Act here challenged is constitutional. Let a peremptory writ issue as prayed.

Wright, C. J., McComb, J., Tobriner, J., Burke, J., Sullivan, J., and Clark, J., concurred.